1

2

3

4    UNITED STATES DISTRICT COURT

5    NORTHERN DISTRICT OF CALIFORNIA

6    EUREKA DIVISION

7

8    SUSAN MURMAN,                          Case No.  24-cv-01439-RMI

9              Plaintiff,

10        v.                                **ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT; DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

11    PATRICIA MURMAN,

12              Defendant.                   Re: Dkt. Nos. 40, 42, 44

13

14        This claim arises out of an unfortunate family dispute over the intentions and obligations

15    of each family member in an ill-fated attempt at purchasing a home and living together, leading

16    parents Susan and Michael Murman to sue their daughter Patricia Murman.[1] While this litigation

17    was ongoing, Michael Murman passed away, leaving Susan to carry his claims forward. The jury

18    trial is currently set for April 6, 2026. Now pending before the court are Defendant's Motion for

19    Judgment on the Pleadings, (dkt. 40), Defendant's Motion for Summary Judgment, (dkt. 42), and

20    Plaintiff's[2] Motion for Partial Summary Judgment, (dkt. 44). Both parties have filed responses,

21    (dkts. 45, 47), and replies, (dkts. 48, 49), and the court heard oral argument on October 21, 2025.

22    These motions have thus been fully briefed and are ripe for a decision. For the reasons stated

23    herein, Defendant's Motion for Judgment on the Pleadings is GRANTED in part and DENIED in

24

25    _____

26    [1] As is customary for intra-family disputes, the court will refer to Plaintiff and Defendant using their first names throughout the opinion to avoid confusion, despite the informality. Although Michael is also the name of Patricia's husband, all references to "Michael" in this Order are to Michael Murman unless otherwise specified.

27

28    [2] Throughout this Order, the court refers only to Plaintiff, singular, even though Susan is now both representing her own claims and carrying forward Michael's claims.

United States District Court
Northern District of California

part; Defendant's Motion for Summary Judgment is DENIED; and Plaintiff's Motion for

Summary Judgment is DENIED.

FACTUAL BACKGROUND[3]

1.  *Facts Alleged in the Complaint and the Claims Brought*

On May 17, 2023, Susan and Michael filed a Complaint in the Superior Court of California

in the County of Humboldt, alleging the following material facts and demanding a jury trial.

(Compl. at 1.)[4] In 2016, Michael sustained a traumatic brain injury and was later diagnosed with

dementia, which was worsened by the brain injury—as a result, he required significant care and

medical interventions. (Compl. ¶¶ 5–7.) Patricia is a servicemember in the U.S. armed forces.

(Compl. ¶ 8.) Sometime in early- to mid-2019, Patricia "convinced" Susan that it was in her best

interest for Michael to become Patricia's dependent so that her parents could access her military

health benefits, and they all needed to reside in the same household in order to carry out this plan.

(Compl. ¶¶ 8–9.) Accordingly, Susan and Patricia entered into an agreement with the following

material terms:

1.  Susan and Michael would sell their home in Eureka, California ("the California Property");
2.  Susan would then apply for a loan and apply the proceeds from the sale of the California Property to the new home;
3.  Susan and Patricia would purchase a home in which all parties would be able to live together comfortably;
4.  Michael would become Patricia's dependent and Patricia would have Michael added to her health benefits for his ongoing care;
5.  Susan, Michael, and Patricia would all be on the title to the purchased property as joint owners.

(Compl. ¶ 11.) Susan then sold the house in Eureka and "took efforts" to qualify for a loan to fund

the purchase of a new home. (Compl. ¶ 12.) The agreement also "specifically required that Susan

and Michael were to be on title to the new home with Patricia." (Compl. ¶ 13.)

---

[3] Because the analysis of the Motion for Judgment on the Pleadings refers only to the Complaint, but the analysis of the Motions for Summary Judgment will refer to additional evidence, the court has split the factual background between the allegations in the Complaint and the additional evidence to provide greater clarity as to the origin of the facts.

[4] Because this proceeding was removed from state court, the Complaint is found in Defendant's Petition for Removal of Civil Action, Exhibit A to the Declaration of Bobby Sims, Dkt. 1-4, at 5–14.

In or around May 2020, Susan provided Patricia with $300,000.00 to go towards the purchase of the new home in reliance on the above agreement; the home was to be purchased in Hawaii, where Patricia was stationed. (Compl. ¶¶ 14–15.) The sale on the new property closed around July 4, 2020—however, although the title company knew about the parties' agreement, neither Susan nor Michael had been added to the title. (Compl. ¶¶ 16–17.) "Prior to and after the closing," Patricia "continually" promised Susan that they would be added to the title. (Compl. ¶ 18.)

Susan trusted Patricia and "continued to abide by the Agreement" so that Michael could become her dependent and receive his extensive necessary care through her medical benefits program. (Compl. ¶ 20.) Sometime later, Patricia "instructed" Susan that it was necessary to pay down their assets for Michael to be eligible to become her dependent—this "paying down" included paying Patricia $5,000.00 a month and paying thousands of dollars for maintenance and repairs on the new property, which "substantially increased the value of the Property." (Compl. ¶¶ 21–22.)

In or around June 2021, "it became clear" to Susan that Patricia was not going to add the parents to the title of the property. (Compl. ¶ 23.) Susan and Michael were then forced to leave the shared property and move to a more affordable residence in Idaho due to their financial circumstances. (Compl. ¶ 24.) They struggled financially after selling their home in Eureka and "spending down" their savings as Patricia directed, and in 2023 they were still not able to access the promised health benefits for Michael's medical care. (Compl. ¶ 25.) After her parents moved to Idaho, Patricia sold the Hawaii property and kept the proceeds from the sale. (Compl. ¶ 26.) Susan issued a demand letter to Patricia on January 6, 2023, to recover the funds Susan had provided to her under the agreement, but Patricia did not respond to the letter or return any of the funds she had obtained from Susan. (Compl. ¶¶ 27–28.)

Pursuant to the foregoing alleged facts, Susan and Michael brought five claims against Patricia. Claim one, for breach of contract, states that the agreement in 2019 is a valid contract pursuant to which Patricia agreed to add her parents to the title of the new home upon Susan's $300,000.00 payment for the purchase of the property plus the cost of maintenance and repairs.

(Compl. ¶¶ 30–32.) The monthly $5,000.00 payments were also made pursuant to the agreement based on Patricia's promise to make Michael her dependent; as such, Susan substantially complied with the terms of the contract. (Compl. ¶¶ 33–34.) However, Patricia did not meet her obligations under the agreement by failing or refusing to add them to the title and to make Michael her dependent. (Compl. ¶¶ 35–36.) Under this cause of action, "[a]s a direct and proximate result of Patricia's breach of the Agreement," Susan and Michael claimed damages in an amount to be proven at trial in excess of $10,000.00, plus interest and attorney's fees and costs under California Code of Civil Procedure Section 1033 et seq. (Compl. ¶ 37.) The second claim asks the court to impose a resulting trust on the proceeds of the sale of the Hawaii home based on Susan's $300,000.00 payment towards the purchase of the home, the failure to add the parents to the title, Patricia's "wrongful[]" authority over the property and the sale proceeds that at least partially belonged to Susan and Michael, and the confidential relationship that existed between the parents and Patricia. (Compl. ¶¶ 38–44.)

The third cause of action is for breach of the implied covenant of good faith and fair dealing, alleging that Patricia's conduct breached the implied covenant under the valid contract and making the same damages request as the first claim for breach of contract. (Compl. ¶¶ 45–50.) The fourth claim is for unjust enrichment based on the $300,000.00 downpayment and payments for repairs made by Susan and the unequitable retention thereof by Patricia. (Compl. ¶¶ 51–53.) Claim four requests damages in an amount to be proven at trial, but not less than $300,000.00, plus interest and attorney's fees and costs. (Compl. ¶ 54.) The final claim is for financial elder abuse under California Welfare and Institutions Code Section 15600 et seq. (Compl. ¶ 56.) This claim first states that the parents are covered by § 15610.07 as Susan was an "elder" under § 15610.27 because she was 67 at the time of the agreement, and Michael was a "dependent adult" under § 15610.23 at that time due to his medical conditions. (Compl. ¶ 57.) It goes on to state that Patricia knew that Susan and Michael were elders or dependent adults; that Susan sold their Eureka home, provided $300,000.00 for the new home, paid thousands of dollars to maintain the new home, and paid Patricia $5,000.00 a month based on Patricia's promises to add them both to the title and add Michael as a dependent; and that Patricia failed to fulfill those promises. (Compl.

¶¶ 58–61.) As such, the Complaint alleges that Patricia's actions constituted the taking, secreting, or appropriating of money and property from Susan and Michael unlawfully based on the trust they placed in her, which is financial elder abuse under § 15657.5(a) and § 15610.30. (Compl. ¶ 62.) The Complaint further alleges that Patricia "is guilty of recklessness, oppression, fraud, and malice" under § 15657.5(b) and California Code of Civil Procedure § 3294. (Compl. ¶¶ 63–64.) Her parents thus request judgment against Patricia for at least $300,000.00, compensatory damages, punitive and exemplary damages in an amount according to proof, treble damages under Civil Code § 3345, and attorney's fees and costs under § 15657.5. (Compl. at 10.)

### 2. *Facts based on the totality of the record*

Before tackling the substance of the evidence submitted, the court notes that most of the evidence in this case is comprised of either the subjective recollections of the parties or objective documents from which intent cannot be readily discerned. The parties have submitted receipts for home repair projects; bank statements; photocopies of checks that contain the names of recipients but no direction as to their use; purchase contracts, escrow wiring instructions, and property sale documents; a "gift letter" for the transfer of funds to the escrow company; a letter rejecting the dependency application; and emails between the parties, real estate agents, accountants, and loan officers discussing the logistics of purchasing a home. These documents are subject to various interpretations, made clear by the remaining evidence: declarations, depositions, and emails between the parties describing the events at issue in this case. This evidence demonstrates that Patricia and Susan have opposite and contradictory recollections of the pertinent events. For example, one email exchange from June 16, 2021, begins with a multi-paragraph email from Susan detailing her perspective on the purchase of the house and subsequent events, including that Patricia did not prioritize the dependency applications, did not make good on her promise to help with caring for Michael, intentionally left Susan off the title, ignored Susan's input as to improvements to the house, and acted disrespectfully towards Susan. (Dkt. 44-1, at 47.) Patricia responded with her own multi-paragraph email disagreeing with her mother's account and describing her own perspective point for point, writing that she expended significant time and energy on the dependency applications, which were her consistent priority; that she tried to get

leave multiple times but was denied; that Susan was the person who chose the house and decided on the improvements with no regard for Patricia's input or protestations that she could not afford it; that she had been in the process of adding Susan to the title and Susan had not seemed to mind waiting until they had fought one day; that Susan's happiness was a primary reason Patricia wanted to get the house together; that she felt steamrolled and disrespected by Susan; and that she felt like she could not do anything to make Susan happy. (Dkt. 44-1, at 45–46.) Susan then disputed *these* points in her deposition testimony in June 2025 when she was asked about the email exchange. (Susan Dep. 39:8–45:19, June 24, 2025, Dkt. 48-1.) This pattern is consistently exhibited throughout the record and the objective evidence does not resolve the differences in the parties' accounts. Keeping in mind the strenuous disagreement as to the parties' understandings, intentions, obligations, motivations, and interpersonal interactions, the court now turns to the substantive content of the evidence submitted.

In 2016, Michael suffered from a traumatic brain injury. (Susan Decl. ¶ 2, Dkt. 44-2.) In the next few years, he was diagnosed with dementia. (*Id.*) These combined ailments necessitated round-the-clock care, as he could not safely be left alone; his wife Susan was the primary provider of this care. (*Id.*) Patricia is a Senior Clinical Aeromedical Psychologist in the U.S. Army. (Patricia Dep. 21:14–17, May 29, 2025, Dkt. 44-1.) She was first stationed in Hawaii in September 2018 while she finished her internship and dissertation studying the impact of traumatic brain injuries on family dynamics. (Patricia Dep. 16:22–17:12.) Sometime in late 2018 or January 2019, Patricia spoke with her mother about the possibility of making them her dependents, which her mother considered in part because she sometimes needed a break from caring for Michael. (Dkt. 44-1, at 18.) This would require Susan and Michael to move to Hawaii, which Patricia thought would appeal to her mother because she remembered Susan expressing a desire to retire there. (Patricia Decl. ¶ 3, Sept. 9, 2025, Dkt. 47-2.) Patricia wrote to her mother by email that she had come up with a few options with different timelines depending on when her parents wanted to move—Susan responded that they would not move fast and "if and when the time comes we'll put our heads together and formulate a plan." (Dkt. 44-1, at 17.) In September 2019, after months of discussion, Susan and Michael agreed that becoming Patricia's dependents was a good idea and

6

United States District Court
Northern District of California

they began to discuss the details of purchasing a house. (Dkt. 1-7, at 30.) Around the same time, Susan emailed her accountant asking about taxes on the money she wanted to give Patricia for a downpayment, and he responded that they would file gift tax returns with no payable tax and that Patricia would not be taxed on the gift. (Ex. 2 to Def.'s Opp., Dkt. 47-1, at 6.)

The plan for the purchase of the house evolved over time. Originally, Susan and Michael qualified for a loan and were going to be the only people on the loan and title; it was later decided that Patricia should be added to the title for inheritance reasons, and then that she should be added to the loan so she would assume the loan on her parents' death without having to refinance. (Dkt. 1-4, at 46–48.) Finally, it was decided the Patricia would be the only one to take out a loan because she got the best interest rate through Veterans' Affairs. (Patricia Dep. 79:1–80:23.) Despite this, Patricia believed that she and her parents had agreed to split the mortgage payments. (Patricia Decl. ¶ 9, Dkt. 47-2.) Patricia also believed she would have qualified for the loan on her own. (Patricia Dep. 176:2–177:20.) Susan testified that Patricia would not have qualified for the loan without the downpayment, and it was financially advantageous for both of them for Patricia to take out a VA loan with the lower interest rate. (Susan Dep. 16:13–23, Dkt. 44-1.) Her parents' payment did reduce the mortgage. (Patricia Dep. 178:4–6.)

At the time of the loan processing, Patricia was informed that it would be easier under Hawaii law for the title of the property to be in her name only, and for her parents to be added after closing. (Patricia Dep. 74:9–20.) Susan was informed by email on May 7, 2020, that only Patricia would appear on the title at closing for simplicity and she and Michael would be added after closing; Susan responded asking if there would be any issues adding them to the title.[5] (Ex. A to Susan Decl., Dkt. 44-2, at 7.) Susan wired $400,000.00 to the escrow company for the downpayment on the house; $100,000.00 was returned to her and not used to purchase the house. (Dkt. 44-1, at 25; Susan Dep. 16:22–23.) To send the money, Susan signed a gift letter certifying the transfer of the funds to be used towards the Hawaii home as a gift. (Dkt. 44-1, at 28.) They

---

[5] Susan testified at her deposition, however, that she was "very surprised" to see that she and Michael were not on the title after closing and that she was not given a good reason for this omission. (Susan Dep. 18:12–19.)

1    closed on the property on or around July 4, 2020. (Def.'s Mot., Dkt. 42, at 10.)

2           The parties intended to share the home. (Patricia Dep. 155:18–21.) Although Patricia

3    testified that she was concerned about adding her parents to the title after the fact, at the time of

4    closing it was her intention to add her parents and she asked for information on how to move

5    forward with that process. (Patricia Dep. 74:21–75:3, 76:17–77:6.) Patricia's loan advisor

6    informed her that it would be better to wait until after filing her taxes to add her parents to the title,

7    and she followed his advice. (Patricia Dep. 179:1–10.) She testified that at some point she

8    downloaded the forms and began to fill them out. (Patricia Dep. 77:13–16.)

9           Patricia testified that she was not sure that the "linchpin" of her parents' decision to move

10    to Hawaii was becoming her dependents. (Patricia Dep. 175:1–8.) She also did not believe that

11    adding her parents to the title was the crux of their agreement to help purchase the property,

12    though she thought "[her] mother expected it." (Patricia Dep. 80:21–81:3.) According to Patricia,

13    she never had a discussion with her mother indicating that the downpayment was made in

14    exchange for her parents' addition to the title, and most of the conversation about the

15    downpayment happened between her mother and the real estate agents. (Patricia Dep. 176:2–

16    177:20.)

17           Susan remembered asking Patricia about being added to the title and Patricia responding

18    that she was working on the paperwork. (Susan Dep. 19:1–6.) She also said that Patricia told her

19    about the advice to wait until after taxes, and then she asked Patricia again about being added to

20    the title after taxes had been filed. (Susan Dep. 19:16–25.)

21           Between April 2020 and September 2021, Susan and Michael made a number of payments

22    for work done to the property, some for repairs and some for other improvements and projects.

23    (Ex. B to Susan Decl., Dkt. 44-2.) These payments totaled $94,233.33. (Susan Decl. ¶ 14, Dkt. 44-

24    2.) The payments covered such projects as roof repairs, plumbing, retaining walls and concrete for

25    a patio, lumber, contractor services, and pest control. (Ex. B to Susan Decl., Dkt. 44-2.) Susan

26    testified that she had agreed to pay for any remodels necessary to make the property wheelchair

27    accessible while they were still deciding on which home to purchase. (Susan Dep. 15:16–22.)

28    Susan and Patricia otherwise completely disagree as to the process for making the improvements

United States District Court
Northern District of California

and who was in charge. Patricia alleges that she told her mother to wait and that she could not afford the changes, and that she was not consulted as to any of the repairs or improvements, many of which occurred while she was at work. (Dkt. 44-1, at 45; Patricia Dep. 154:18–19, 155:18–21.) Susan, on the other hand, contends that Patricia knew about and directed the major repairs and induced her mother to pay for them through promising to add them to the title. (Dkt. 44-1, at 47; Susan Decl. ¶ 15, Dkt. 44-2.)

While Susan and Michael lived at the Hawaii property, Susan wrote sixteen checks to Patricia totaling $45,300.00. Of these, $10,000.00 was for the J-1 and other incidentals associated with closing on the house; $20,000.00 was a wedding present for Patricia's engagement; and $4,000.00 was for Patricia's fees for four board exams. (Patricia Dep. 103:7–16, 112:5–19; Susan Decl. ¶ 16, Dkt. 44-2.) However, Patricia and Susan dispute the purpose of the remaining $11,300.00: while they agree that some portion of it was for the parents' share of utilities, groceries, and living expenses, Susan claims that some of it was intended to go towards the mortgage while Patricia says that at no point did her parents contribute to the mortgage payments nor tell her that the checks were intended to cover the mortgage. (Susan Decl. ¶ 16, Dkt. 44-2; Patricia Decl. ¶ 14, Dkt. 47-2; Patricia Dep. 106:7–107:5.)

Patricia testified that her priority was adding her parents as her dependents. In June 2021, she wrote an email to her mother where she said that the dependency was her priority and had required significant work for which she was unprepared. (Dkt. 44-1, at 45.) On November 19, 2020, Patricia received a letter that her application to have her parents be her dependents was not approved because "dependent's income is more than half of the dependent's monthly expenses." (Ex. I to Patricia Decl., July 28, 2025, Dkt. 42-2, at 4.) Susan believed that Patricia tried to file the dependency applications with the intention of adding them as dependents, but that she did not research the requirements. (Susan Dep. 36:6–11.) Patricia said that the only thing left to accomplish before she left for Korea was an update to her parents' financial situation so they could qualify. (Dkt. 44-1, at 45.)

In February 2021, Patricia received orders to deploy to Korea for a permanent change of duty station. (Patricia Decl. ¶ 17, Dkt. 47-2.) This change meant that she would no longer receive

a housing subsidy for the Hawaii home. (*Id.*) In March 2021, Susan learned about the upcoming change in duty station; Susan and Patricia then had an interaction that Patricia described as a "verbal argument" in which Susan "erupted" and was "yelling" at her, (Patricia Decl. ¶ 18, Dkt. 47-2; Patricia Dep. 77:17), and that Susan described as "a frank discussion laying out the facts of what I knew," (Susan Dep. 43:6–9). Patricia decided she "was not going to pursue" adding her parents to the title on her own sometime after this argument. (Patricia Dep. 157:12–16.) She had made this decision by June 2021. (Patricia Dep. 175:14–176:1.)

Patricia left for duty training in April 2021 and deployed to Korea in May 2021. (Patricia Decl. ¶ 19.) Without the housing subsidy, Patricia could not afford the mortgage and asked her mother to help her with payments; after her mother refused, Patricia said she would rent out the house after her parents had departed in order to afford it. (Dkt. 44-1, at 48.) In response, Susan emailed Patricia that "as far as giving you more money for utilities and house payment I think giving you $300,000.00 plus, a new roof, huge patio and landscaping for a house I have no legal interest in is enough." (Dkt. 44-1, at 47.) Susan and Michael left Hawaii for Idaho in September 2021. (Ex. C to Susan Decl., Dkt. 44-2, at 43.) When she left, Susan told Patricia to pay her $300,000.00 after she sold the house. (*Id.* at 44.)

After Susan left, Patricia sold the Hawaii house for $1,700,000.00, of which she received $723,499.16. (Ex. C to Susan Decl., Dkt. 44-1, at 51.) Patricia testified that she used the majority of the proceeds from the sale of the Hawaii home to make a down payment on a new house in North Carolina, and that she used about $25,000.00 on an emergency trip to Michigan to retrieve her husband's nephews, over whom they eventually obtained custody. (Patricia Dep. 183:14–185:13.)

In an email from February 2022, Susan referenced that the Hawaii house had sold a month earlier and she had not received the money; she wrote that Patricia's fiancé "told me that you agreed to give [the $300,000.00] back to me when the house sold" and asked if she planned on keeping the money. (Ex. C to Susan Decl., Dkt. 44-2, at 45.) In another email from the same exchange, Susan referenced multiple payments she had made for Patricia and her payments for home repair, told Patricia that she would file elder abuse charges against her if she did not return

the money, and said she was paying $6,000.00 a month to house Michael in an assisted living facility and needed the money for another house. (*Id.* at 49.) Patricia wrote back that "threatening to file false charges for abuse against me is completely and totally unacceptable," and that she would never have accepted the gifts from her mother if she had known Susan would cite them during the housing money dispute as "leverage." (*Id.*) She also wrote that if her mother planned on filing an elder abuse claim, she would no longer attempt to communicate with her. (*Id.* at 51.) This claim followed.[6]

## LEGAL STANDARD

### 1. *Judgment on the Pleadings*

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Because a Rule 12(c) motion is 'functionally identical' to a Rule 12(b)(6) motion, 'the same standard of review applies to motions brought under either rule.'" *Gregg v. Dep't of Public Safety*, 870 F.3d 883, 887 (9th Cir. 2017) (quoting *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011)) (internal quotations omitted). Thus, in evaluating a Rule 12(c) motion, the court accepts as true all nonconclusory factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. *See TwoRivers v. Lewis*, 174 F.3d 987, 990 (9th Cir. 1999); *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). The complaint must state a plausible claim for relief. *Ashcroft*, 556 U.S. at 681–83. "A judgment on the pleadings is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998). The court may also consider undisputed, judicially noticeable facts. *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (internal quotations omitted). On granting

---

[6] Susan and Michael first filed these claims in Idaho state court on February 17, 2023, (Dkt. 1-4, at 31 – 38); after Patricia moved to dismiss for lack of personal jurisdiction, they voluntarily dismissed the claims without prejudice and refiled in California state court on May 17, 2023, (Dkt. 1-5, at 4–15; Dkt. 1-4, at 5–14). On November 20, 2023, Patricia moved to quash the summons and complaint for lack of personal jurisdiction. (Dkt. 1-5, at 18–28.) This motion was denied. (Dkt. 1-7, at 54.) Patricia's appeal and petition for writ of mandate were also denied. (Dkt. 1-9, at 11; Dkt. 1-10, at 188.) On March 8, 2024, she filed her petition of removal with this court under diversity jurisdiction. (Def.'s Pet., Dkt. 1.)

1    a motion for judgment on the pleadings, the court may give leave to amend, grant dismissal, or

2    enter judgment. *See Lonberg v. City of Riverside*, 300 F. Supp. 2d 942, 945 (C.D. Cal. 2004).

3        *2.   Summary Judgment*

4        Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate

5    that there is "no genuine issue as to any material fact and that the moving party is entitled to

6    judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the

7    outcome of the case under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

8    (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable

9    jury to return a verdict for the nonmoving party. *Id.*

10       The party moving for summary judgment bears the initial burden of identifying those

11   portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine

12   issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party

13   will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

14   reasonable trier of fact could find other than for the moving party. But on an issue for which the

15   opposing party will have the burden of proof at trial, the moving party need only point out "that

16   there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

17       Once the moving party meets its initial burden, the nonmoving party must go beyond the

18   pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

19   genuine issue for trial." Fed. R. Civ. P. 56(e). To carry this burden, the non-moving party must

20   "do more than simply show that there is some metaphysical doubt as to the material facts."

21   *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere

22   existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the

23   jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252 (1986). If the

24   nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter

25   of law." *Celotex Corp.*, 477 U.S. at 323.

26       When reviewing simultaneous cross-motions for summary judgment, the court must

27   consider the evidence submitted in support of and in opposition to both motions before ruling on

28   either one. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136–37

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

(9th Cir. 2001). However, it is the job of the parties to support their arguments with specific factual showings; while the court may consider other documents on file when appropriate, it has no obligation to sort through papers not specifically cited by the parties. *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028–31 (9th Cir. 2001). The court draws all inferences in the light most favorable to the nonmoving party but does not make credibility determinations or weigh conflicting evidence when reviewing the record on summary judgment. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).

## DISCUSSION

Defendant moves for judgment on the pleadings and summary judgment in her favor as to all five claims asserted in the Complaint; Plaintiff moves for summary judgment in her favor as to only claim four for unjust enrichment. Both parties have opposed each other's motions. As such, the court will address the motions claim by claim, following the Complaint.

### Claim One: Breach of Contract

Defendant moves for judgment on the pleadings and summary judgment as to Plaintiff's claim for breach of contract on the following grounds: (1) the claim is barred by the statute of frauds; (2) Plaintiff has not pled or demonstrated sufficient performance to avoid the statute of frauds through estoppel; (3) assuming the statute of frauds does not bar the contract, Plaintiff did not allege or show her own performance of the contract, failing one element of a claim for breach of contract; and (4) the claim is barred by the two-year statute of limitations for verbal contracts. (Def's Mot., Dkt. 42, at 9–10.) Plaintiff counters that there is sufficient evidence of partial performance and significant reliance to remove the case from the Statute of Frauds and sufficient evidence that Defendant's conduct caused any delay in bringing the case, and therefore there is evidence demonstrating a dispute of material fact as to this claim. She also argues she properly pled these facts in the Complaint.

*1. The Statute of Frauds*

The California Statute of Frauds generally bars enforcement of oral agreements involving interests in real property that are not reduced to writing, which encompasses the contract alleged in this case. Cal. Civ. Code § 1624(a)(3). However, California courts have recognized exceptions to

the statute of frauds under the doctrines of part performance and equitable estoppel.[7] For contracts involving the transfer of real property, part performance may estop the statute of frauds when one party has demonstrated ownership and has made significant improvements to the property. *E.g.*, *Calanchini v. Branstetter*, 24 P. 149, 150 (Cal. 1890) ("the taking of actual possession of the land" and "the making of valuable improvements upon the land" are sufficient part performance to take a verbal contract for the sale of land out of the statute of frauds); *Sutton v. Warner*, 15 Cal. Rptr. 2d 632, 637 (Cal. Ct. App. 1993) (finding part performance where the plaintiffs maintained possession of property they first possessed as tenants and made improvements thereon). In general, the payment of money is not enough to overcome the statute of frauds, as there is a sufficient remedy at law addressing payment under an invalid contract. *See Shive v. Barrow*, 199 P.2d 693, 699 (Cal. Ct. App. 1948) ("It is well settled that neither the payment of money, even though it is the full amount agreed to be paid, nor the rendering of services, which formed the consideration of an oral agreement, is a sufficient part performance to take an oral agreement out of the statute of frauds or to authorize a decree of specific performance."). The acts constituting part performance should be attributable to the oral agreement, and "must be done with the consent and knowledge of the other party." *Foster v. Maginnis*, 26 P. 828, 829 (Cal. 1891); *see also In re Marriage of Benson*, 116 P.3d 1152, 1160 (Cal. 2005) ("to constitute part performance, the relevant acts either must 'unequivocally refer[]' to the contract. . . or 'clearly relate' to its terms." (internal citations omitted)).

Equitable estoppel, on the other hand, is invoked when allowing the party asserting the statute of frauds to render the contested agreement unenforceable would be equivalent to fraud or

---

[7] While part performance and equitable estoppel are technically different grounds for overcoming the statute of frauds, *see Byrne v. Laura*, 60 Cal. Rptr. 2d 908, 919–20 (Cal. Ct. App. 1997), courts frequently conflate the two doctrines. *See, e.g.*, *Anderson v. Stansbury*, 242 P.2d 305, 310 (Cal. 1952) ("Before a party can be estopped to assert the statute due to the other's part performance, it must appear that a sufficient change of position has occurred so that the application of the statutory bar would result in an unjust and unconscionable loss, amounting in effect to a fraud."); *Estate of Seibert*, 276 Cal. Rptr. 508, 511 (Cal. Ct. App. 1990) (requiring reliance on the promise and acts "unequivocally referable" to the oral agreement for estoppel to apply); *In re Marriage of Benson*, 116 P.3d 1152, 1159 (Cal. 2005) ("where assertion of the statute of frauds would cause unconscionable injury, part performance allows specific enforcement of a contract that lacks the requisite writing"). Plaintiff and Defendant make arguments under both part performance and equitable estoppel without consistently distinguishing between the two doctrines, so the court will address both.

unjust enrichment. *Monarco v. Lo Greco*, 220 P.2d 737, 739–40 (Cal. 1950). Parties asserting equitable estoppel must show that they made a sufficient change of position in reliance on the oral agreement such that non-enforcement of the agreement would lead to "unconscionable injury." *Monarco*, 220 P.2d at 739; *see also Anderson*, 242 P.2d at 310 ("Before a party can be estopped to assert the statute due to the other's part performance, it must appear that a sufficient change of position has occurred so that the application of the statutory bar would result in an unjust and unconscionable loss, amounting in effect to a fraud."). Estoppel is generally a question of fact. *Mehl v. People*, 532 P.2d 489, 492 (Cal. 1975); *Byrne*, 60 Cal. Rptr. 2d at 917.

Under the judgment on the pleadings standard, the plaintiff must allege facts that, assumed to be true, would bring the contract out of the operation of the statute of frauds. To allege sufficient part performance of a contract for the transfer of property, the complaint may allege facts such as possession, the making of valuable improvements, "or other acts unequivocally referrable to the verbal agreement." *Harrison v. Hanson*, 331 P.2d 1084, 1088 (Cal. Ct. App. 1958). "Before estoppel applies, the party so pleading must allege that refusal to enforce the oral contract will result in (1) unconscionable injury because the party pleading estoppel seriously changed its position in reliance on the oral contract, or (2) the unjust enrichment of the party pleading the statute of frauds as a defense because that party received the benefits of the other's performance." *Smyth v. Berman*, 242 Cal. Rptr. 3d 336, 349 (Cal. Ct. App. 2019) (quoting *Monarco*, 220 P.2d at 739–40) (citation modified).

Defendant has not shown that she is entitled to judgment on the pleadings because Plaintiff has sufficiently alleged facts to support estopping the statute of frauds. First, as to part performance, the Complaint alleges that Plaintiff spent considerable sums of money on improvements to the Hawaii property—and, while it does not explicitly state that Susan and Michael occupied the property pursuant to the agreement, the clear inference from the facts alleged is that they moved to Hawaii and lived at the property. (Compl. ¶¶ 20–24.) Second, related to equitable estoppel, the Complaint alleges facts showing Susan and Michael significantly changed their position, including that they sold their Eureka home, moved to Hawaii, and heavily invested in improving the Hawaii home in reliance on Defendant's promises related to the title and

1    Michael's dependency status. (Compl. ¶¶ 12, 20–24.) These facts go beyond the mere payment of

2    money. Instead, the allegations in the Complaint are substantial and sufficient to show part

3    performance and change in position that could take the contract out of the operation of the statute

4    of frauds. *See Hoffman v. Fett*, 39 Cal. 109, 112 (1870) (finding that complaint alleging possession

5    and expense of money and labor on property sufficiently pled part performance to estop statute of

6    frauds and reversing judgment sustaining demurrer); *Whorton v. Dillingham*, 248 Cal. Rptr. 405,

7    411 (Cal. Ct. App. 1988) (allegations that plaintiff stopped education early to assist defendant's

8    business venture in reliance on promises of support and sharing of property were sufficient to

9    prevent defendant from raising the statute of frauds by demurrer); *Cf. Smyth*, 242 Cal. Rptr. 3d. at

10   349 (allegations in complaint either constituted the payment of money, which is insufficient to

11   defeat the statute of frauds, or happened prior to the agreement, in which case they did not occur in

12   reliance on the agreement).

13       For similar reasons, Defendant has not shown that she is entitled to summary judgment on

14   the breach of contract claim based on the statute of frauds because Plaintiff has shown there is a

15   question of material fact as to equitable estoppel. In her brief, Plaintiff points to "the transfer of

16   sale proceeds, co-occupancy of the property, and continued financial contributions" by Susan and

17   Michael as the acts constituting part performance and as a demonstration of the change in position

18   that would render non-enforcement unjust. (Pl.'s Opp., Dkt. 45, at 11.) Defendant responds that, in

19   addition to their failure to show sufficient part performance or circumstances justifying equitable

20   estoppel, the statute of frauds may not be equitably estopped in this case because the contract here

21   involves the creation of a joint tenancy. (Def.'s Reply, Dkt. 48, at 2.)

22       First, the court is not convinced by Defendant's argument that equitable estoppel cannot be

23   applied to this case because it involves a joint tenancy. While most cases estopping the statute of

24   frauds involve straightforward transfers of real property, the California Supreme Court has applied

25   the doctrines of equity and part performance to other kinds of contracts that would otherwise fall

26   within the statute of frauds. *See In re Marriage of Benson*, 116 P.3d at 1159 ("The doctrine most

27   commonly applies in actions involving transfers of real property . . . [y]et, part performance has

28   also been used to enforce other contracts that violate the statute of frauds" (internal citations

16

1    omitted)); *Seymour v. Oelrichs*, 106 P. 88, 94 (Cal. 1909) ("We can see no good reason for

2    limiting the operation of this equitable doctrine to any particular class of contracts included within

3    the statute of frauds, provided always the essential elements of an estoppel are present. . ."),

4    *overruled on other grounds by Sterling v. Taylor*, 152 P.3d 420 (Cal. 2007). However, California

5    appellate courts are split on whether an agreement to create a joint tenancy can be removed from

6    the statute of frauds through part performance and estoppel or whether the character of joint

7    tenancy precludes such actions in equity. *Compare Estate of Seibert*, 276 Cal. Rptr. 508, 511 (Cal.

8    Ct. App. 1990) ("The unique nature of a joint tenancy, it seems, is such as to constitute its writing

9    requirement a more formidable 'statute of frauds' than the ordinary requirement pertaining to

10   contracts having to do with real property"), *with Byrne v. Laura*, 60 Cal. Rptr. 2d 908, 918 (Cal.

11   Ct. App. 1997) ("we fail to see why an agreement for a joint tenancy in real property should be

12   treated differently for equitable purposes than any other conveyance of land. . .").

13          The court declines to rely on *Estate of Seibert* to preclude equitable estoppel in this case

14   because of the alleged intent to create a joint tenancy—given the active disagreement on the issue

15   between California courts of appeal, it is more apt to apply the general principle endorsed by the

16   California Supreme Court that equitable estoppel may be used to prevent fraud or unjust

17   enrichment, whatever the nature of the alleged contract. Moreover, the exact nature of the property

18   interests created by the alleged contract in this case is not clear. While the parties did intend to

19   share the home, they may have intended to create any number of property interests, such as a life

20   estate in the property for the parents with the remainder to Patricia, or a tenancy in common

21   (perhaps because Patricia would inherit her parents' share upon their death but not vice versa, or

22   because Patricia would hold 50% interest and her parents would each hold 25%, etcetera).

23   Defendant points to no evidence that establishes what kind of property interest the parties intended

24   to create. It would be inappropriate to apply the contested rule exempting oral joint tenancy

25   agreements from equitable estoppel where it is not certain that the agreement would create a joint

26   tenancy in the first place.

27          Second, there is a triable issue of fact as to whether the actions taken by Susan and Michael

28   were in reliance on the contract and whether those acts constituted a "substantial" change in

position such that it would be unjust not to enforce the contract. Plaintiff has proffered evidence that the parents sold their home, moved to a new state, and spent nearly one hundred thousand dollars on home improvements under the expectation that the terms of the alleged contract would be fulfilled. (*See, e.g.*, Susan Decl. ¶¶ 10, 15, Dkt. 44-2; Ex. B to Susan Decl., Dkt. 44-2.) There is also some evidence that, at least once, Patricia represented to her mother that she would be adding her parents to the title. (Susan Dep. 18:20–19:6.) This is the kind of evidence that can demonstrate detrimental reliance and a significant change of position, the requirements for equitable estoppel. Defendant's argument that Plaintiff does not allege or demonstrate fraudulent conduct by Patricia misunderstands the principle that equitable estoppel applies when "application of the statutory bar would result in an unjust and unconscionable loss, amounting in effect to a fraud." *Anderson*, 242 P.2d at 310. This "fraud" is a description of the ends rather than the means; Plaintiff does not have to allege or prove that Patricia intended to defraud or mislead, only that her conduct created a reasonable belief on which Susan relied and that failure to enforce the contract given these facts would result in unconscionable injury. *See Notten v. Mensing*, 45 P.2d 198, 202 (Cal. 1935). Plaintiff has pointed to evidence that Patricia represented to Susan that she would add her parents to the title, and that Susan relied on her future interest in the Hawaii home when deciding to move and invest in repairing the new house. This is the kind of evidence that has been accepted for the purposes of equitable estoppel, and it is for the trier of fact to decide whether it should defeat the statute of frauds in this case.[8] *See, e.g.*, *SOAProjects, Inc. v. SCM Microsystems, Inc.*, No. 10-CV-01773-LHK, 2010 WL 5069832, at *6–8 (N.D. Cal. Dec. 7, 2010).

---

[8] Plaintiff also argues that she has put forward sufficient evidence to support part performance through the same evidence of "the transfer of sale proceeds, co-occupancy of the property, and continued financial contributions." The payment of the purchase money for the Hawaii home alone is not sufficient to estop the statute of frauds. The issue of occupancy is more difficult, as occupancy or ownership is typically considered in cases of a straightforward transfer of property and is thus required to be "actual, visible, notorious, and exclusive." *Sutton*, 15 Cal. Rptr. 2d at 637. But these requirements, especially exclusivity, cannot be adequately applied in this case where Plaintiff and Defendant agreed that they would live on the property together. Moreover, whether the part performance—including the improvements to the property—was related to the alleged contract is not clear. These issues give rise to a broader question of sufficiency of the part performance, a factual question underpinned by contradictory evidence that is not suitable for adjudication at summary judgment. In addition, Defendant's argument that Patricia did not consent to the improvements or did not have advance knowledge of the improvements to the home—rendering the part performance insufficient to estop the assertion of the statute of frauds—is only applicable to part performance and is itself a question of fact most appropriate for a jury to decide.

United States District Court
Northern District of California

1

*2. Breach of Contract–Plaintiff's Performance*

A claim for breach of contract in California has four elements that a plaintiff must plead and prove: "(1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff." *Walsh v. W. Valley Mission Cmty. Coll. Dist.*, 78 Cal. Rptr. 2d 725, 733 (Cal. Ct. App. 1998). "He who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed." *Cameron v. Burnham*, 80 P. 929, 930 (Cal. 1905). Thus, a plaintiff bringing an action for breach of contract must either allege that they have fulfilled their own duties under the contract or that they have a valid excuse for nonperformance of their obligations. *See Rathbun v. Security Mfg. Co.*, 256 P. 296, 297 (Cal. Ct. App. 1927) ("It is elementary that one party to a contract cannot compel another to perform while he himself is in default.").

Defendant asserts that judgment on the pleadings should be rendered in her favor on the breach of contract claim because Plaintiff has failed to plead her own performance under the contract. She specifically argues that Plaintiff failed to state that she performed two of the alleged essential terms of the contract: jointly purchasing the house with Patricia and taking out the loan to finance the house. (Def.'s Mot., Dkt. 40, at 5; Def.'s Reply, Dkt. 46, at 3.) Plaintiff responds that those terms were modified by the parties and Plaintiff performed under the modified terms. (Pl.'s Opp., Dkt. 45, at 11–12.)

The original contract as alleged in the Complaint includes the following material terms: (1) Susan and Michael would sell their home in California; (2) Susan would apply for a loan and apply the proceeds from sale of the California home to the new house in Hawaii; (3) Susan and Patricia would purchase a home for all three parties to live in; (4) Michael would become Patricia's dependent and be added to her healthcare benefits; and (5) Susan, Michael, and Patricia would be on the title of the house as joint owners. (Compl. ¶ 11.) There is no other agreement or modification set forth in the Complaint, nor any facts that might suggest that the parties reached a new arrangement.

Based on the agreement set forth above, Plaintiff sufficiently alleged her own performance. The Complaint states that Susan "took efforts to meet the various requirements set forth by

Patricia, including selling the California Property and qualifying for a loan." (Compl. ¶ 12.) While this is somewhat ambiguous—selling the California house and qualifying for a loan could either refer back to Patricia's requirements or to the efforts taken by Susan—the Complaint later states that Susan did in fact sell the California property. (Compl. ¶ 14.) The inference is thus that she also applied and qualified for a loan. There is no explicit allegation in the Complaint that Susan purchased the house with Patricia as required by the contract, but it does state that she gave Patricia $300,000.00 for the purchase of the new home—as the contract terms do not define "together," this statement sufficiently alleges that both Patricia and Susan were involved in the purchase of the house. Plaintiff thus alleged her own performance under the contract terms delineated in the Complaint.

Defendant moves for summary judgment based on the same element of breach of contract: failure to demonstrate performance or excuse for nonperformance. Plaintiff argues that she sufficiently performed under the contract. According to Plaintiff, the parties modified the contract terms listed in the Complaint such that Patricia was to apply for a loan and purchase the house, rather than Susan, and Patricia was to add her parents to the title of the home after the home was purchased. Plaintiff thus says she performed under the terms of the modified contract. (Pl.'s Opp., Dkt. 45, at 12.)

The parties' initial plan as to how the Hawaii house would be purchased was ultimately not how the purchase was accomplished. The evidence submitted demonstrates that the plan evolved over time: Susan and Michael were initially poised to take out the loan and make the downpayment, then Patricia needed to be added to the loan for financial simplicity, and finally Patricia took out the loan alone in order to get a better interest rate. Whether Plaintiff can successfully show her own performance then depends on whether a contract existed and, if so, the terms of that contract. "Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed." *Herbalife Int'l of Am., Inc. v. E. Comput. Exch., Inc.*, 723 F. Supp. 3d 888, 905 (C.D. Cal. 2024) (quoting *Bustamante v. Intuit, Inc.*, 45 Cal. Rptr. 3d 692, 699 (Cal. Ct. App. 2006)). Plaintiff and Defendant have both proffered evidence as to their actions and intent at

various points in the discussion over purchasing the house, which could support finding either that a contract did exist or did not exist, with different terms depending on when the contract was formed and if it was successfully modified. As such, this is a question of fact for the jury not appropriate for disposition at summary judgment. *See Byrne*, 60 Cal. Rptr. 2d at 916 ("Where, as here, the agreement is reasonably susceptible of different interpretations, summary adjudication is an inappropriate means of resolving the ambiguity.").

### 3. Statute of Limitations

Under California law, "an action upon a contract . . . not founded upon an instrument of writing" must be brought within two years. Cal. Code Civ. Proc. § 339. The time begins to run for the statute of limitations when the plaintiff knows or has reason to suspect that the contract has been breached or repudiated. *See Romano v. Rockwell Int'l, Inc.*, 926 P.2d 1114, 1119–20 (Cal. 1996) (a cause of action for breach of contract does not accrue until the time of breach or the repudiation of the contract); *E-fab, Inc., v. Accountants, Inc.*, 64 Cal. Rptr. 3d 9, 15–16 (Cal. Ct. App. 2007) (cause of action accrues when the plaintiff could reasonably discover a breach). However, "[i]n the statute of limitations context, equitable estoppel may be appropriate where the defendant's act or omission actually and reasonably induced the plaintiff to refrain from filing a timely suit." *Doe v. Marten*, 263 Cal. Rptr. 3d 547, 551 (Cal. Ct. App. 2020). The emphasis is on the active conduct of the defendant that prevents a plaintiff from filing suit.[9] In essence, a defendant whose conduct induces a plaintiff to refrain from filing a claim may not turn around and use the statute of limitations as a defense.[10] *See, e.g.*, *Herman v. Brown*, 205 P.2d 1086, 1088 (Cal.

---

[9] Under California law, the elements of estoppel are the following: "(1) the party to be estopped must be apprised of the facts; (2) that party must intend that his or her conduct be acted on, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and (4) the party asserting the estoppel must reasonably rely on the conduct to his or her injury." *Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1051–52 (9th Cir. 2008) (quoting *Honig v. San Francisco Plan. Dep't*, 25 Cal. Rptr. 3d 649, 655 (Cal. Ct. App. 2005)). Some California courts have interpreted these requirements such that it is not necessary to show intent to mislead, bad faith, or actual fraud on the part of the party to be estopped. *See Doe*, 263 Cal. Rptr. 3d at 551.

[10] Equitable estoppel and equitable tolling are different doctrines that both allow an extension of the limitations period. While equitable estoppel is generally focused on the actions of the defendant and the possibility of their "fraudulent concealment," equitable tolling asks whether "a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period." *Johnson v. Henderson*, 314 F.3d 409, 414 (9th Cir. 2002). Despite these differences, equitable tolling has also been applied in situations where the reason a plaintiff was unable to discover the cause of action through due diligence was

United States District Court
Northern District of California

1  Ct. App. 1949) (one who induced a creditor not to bring a suit with promises to pay debt was

2  estopped from raising statute of limitations); *Langdon v. Langdon*, 117 P.2d 371, 373 (Cal. Ct.

3  App. 1941) (son who repeatedly asked his father to delay collecting his promised bonus was

4  estopped from raising the statute of limitations). The existence of an estoppel and the resolution of

5  the statute of limitations question is generally a question of fact unless "the evidence is not in

6  conflict and is susceptible of only one reasonable inference." *Doe*, 263 Cal. Rptr. 3d at 552

7  (quoting *Driscoll v. City of Los Angeles*, 431 P.2d 245, 255 (Cal. 1967)); *see also Fox v. Ethicon*

8  *Endo-Surgery, Inc.*, 110 P.3d 914, 922 (Cal. 2005) ("Resolution of the statute of limitations issue

9  is normally a question of fact.").

10  　　　　Defendant contends that the breach of the material terms of the contract was known to

11  Plaintiff after the date of closing on the property and no later than the day Plaintiff moved in to the

12  house on or around July 4, 2020—she contends Plaintiff knew or should have known by this date

13  that the parents were not included on the title, and thus this action is untimely and she is entitled to

14  judgment on the pleadings. However, Plaintiff has sufficiently alleged facts to argue that

15  Defendant's own conduct was responsible for the delay in the filing of this action to defeat

16  judgment on the pleadings. In the Complaint, Plaintiff states that Patricia "continually"

17  represented that she would add Susan and Michael to the title of the property and that she was

18  working to add Michael as her dependent, and that it was not "clear" to Susan that Patricia did not

19  actually intend to add them to the title until around June 2021. (Compl. ¶¶ 18, 23.) Plaintiff further

20  states that they trusted Patricia and reasonably relied on her promises because she is their

21  daughter. (Compl. ¶ 20.) As such, she has alleged facts sufficient to prevent the invocation of the

22  statute of limitations at judgment on the pleadings.

23  　　　　Defendant's argument for summary judgment is the same as above regarding the evidence,

24  (Def.'s Mot., Dkt. 42, at 10.); however, Plaintiff has proffered sufficient evidence of Defendant's

25  behavior to create a material dispute as to when the cause of action accrued and whether equitable

26

27  the deliberate concealment of information by the defendant. *See Supermail Cargo, Inc. v. United States*, 68
F.3d 1204, 1207 (9th Cir. 1995). Plaintiff mentions both doctrines and relies on the facts indicating
28  misrepresentation by Defendant; as such, while both doctrines may be implicated, the court only considers
equitable estoppel.

United States District Court
Northern District of California

1  estoppel should apply. Plaintiff contends that the cause of action did not accrue until Defendant

2  refused to add her parents to the title, and Defendant misrepresented her intention to add Plaintiff

3  to the title such that Susan did not suspect her repudiation until sometime in the summer of 2021.

4  (Pl.'s Opp., Dkt. 45, at 13.) Under the alleged modified agreement, Defendant assumed

5  responsibility for adding Plaintiff to the title—a process which would occur after closing—and no

6  timeline for such addition was specified. Susan testified at her deposition that she asked Patricia

7  about the title issue more than once, and that Patricia would say that she was in the process of

8  adding them or working on paperwork—she recalled at least one conversation where Defendant

9  indicated that she was instructed to wait until after filing her taxes, and said these claims

10 convinced her that Patricia was working towards adding her to the title. (Susan Dep. 19:16–24,

11 Dkt. 42-1.) Defendant testified that she originally intended to add Plaintiff to the title and took

12 steps to add her after closing. (Patricia Dep. 80:18–23, Dkt. 44-1.) Moreover, Defendant testified

13 that by June 2021, she had decided not to pursue adding Plaintiff to the title. (Patricia Dep.

14 175:14–176:1, Dkt. 44-1.) Under any version of the contract terms, the evidence that Defendant

15 intended to add Plaintiff to the title until sometime after she learned she was to be stationed in

16 Korea but before June 2021 creates a factual question as to when her repudiation (and thus, the

17 cause of action) began to accrue. Moreover, Susan's testimony that Patricia told her she was

18 working on adding the parents to the title at least once and that she relied on that statement is

19 enough to implicate equitable estoppel. As such, there is a factual question as to when Plaintiff

20 knew or should have known that she would not be added to the title of the house that is not

21 appropriate to resolve at the summary judgment stage. *See Supermail Cargo, Inc.*, 68 F.3d at 1207

22 ("a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no

23 set of facts that would establish the timeliness of the claim.").

24     *4.  Breach of Contract Claim—Conclusion*

25         Plaintiff has demonstrated that there is a question of material fact for each element of the

26 breach of contract claim on which Defendant moves for summary judgment. In addition to the

27 explanation above, the majority of the parties' arguments are predicated on their disagreement as

28 to whether an oral contract was validly formed, the content of the terms of that contract, and when

United States District Court
Northern District of California

or whether a breach of that contract should have been known.[11] The evidence identified by the parties indicates that Patricia and Susan agreed that Susan and Michael should move to Hawaii in order to facilitate Patricia's adult dependency application for Michael; that they originally intended for Susan to take out the loan and apply the downpayment; that Patricia eventually took out the loan alone, and ended up on the title alone for that reason; that Susan asked whether there would be any issues adding her and Michael to the title after the closing; that Patricia originally intended to add her parents to the title; and that Patricia began the process of adding them to the title. From these facts, a reasonable fact finder could reach multiple inferences regarding whether a contract was formed and what the terms of that contract entailed.[12] "Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed." *Bustamante v. Intuit, Inc.*, 45 Cal. Rptr. 3d 692, 699 (Cal. Ct. App. 2006). Moreover, "[w]hen the contract relied on is oral, its interpretation in the first instance is a question of fact to be determined by the jury." *Treadwell v. Nickel*, 228 P. 25, 33 (Cal. 1924), *disapproved of on other grounds by Conservatorship of O.B.*, 470 P.3d 41 (Cal. 2020). Because the Complaint plausibly states facts supporting the breach of contract claim, and because there are material factual questions that must be decided by the trier of

---

[11] Defendant argues that Plaintiff's assertion that the terms of the contract changed by mutual assent demonstrates that there is no sufficiently definite contract under which a breach of contract claim may be enforced. (Def.'s Reply, Dkt. 46, at 3.) However, the fundamental issue is not the definiteness of the terms but whether a contract was formed, and if so, what the terms of that contract entailed. Plaintiff contends that the contract was modified such that Patricia was required to take out the loan and add Plaintiff to the title after closing—there is nothing indefinite about these terms. As such, formation rather than definiteness is the primary issue.

[12] For example, a fact finder could find that at no point did the parties manifest mutual consent to the same set of terms, and no valid contract was formed. A fact finder could also find that the parties did agree to a contract based on the original plan for financing the house but did not successfully modify the agreement when those plans changed. Or they could find that the offer of dependency was the primary purpose of the purchase of the house and move to Hawaii, and the subjective expectations of Susan that she and Michael would be added to the title was not a key element agreed upon as part of the contract. (*See, e.g.*, Susan Dep. 40:22–25 ("She did not successfully get us added as dependents; therefore, the whole reason for us moving to Hawaii was . . . null and void").) These are only some of the possible findings that could be made given the evidence submitted. "'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties,' and 'questions of "intent" and "purpose" are ordinarily questions of fact.' Where, as here, the agreement is reasonably susceptible of different interpretations, summary adjudication is an inappropriate means of resolving the ambiguity." *Byrne*, 60 Cal. Rptr. 2d at 916 (internal citations omitted) (first quoting *Bank of the West v. Superior Court*, 833 P.2d 545, 552 (Cal. 1992), then quoting *Redke v. Silvertrust*, 490 P.2d 805, 810 (Cal. 1971)).

1    fact, Defendant's requests for judgment on the pleadings and summary judgment as to claim one

2    are DENIED.

3    **Claim Two: Resulting Trust**

4    Plaintiff's second cause of action asks for a resulting trust to be imposed on the proceeds

5    of the sale of the Hawaii house. The resulting trust "has been termed an 'intention-enforcing' trust,

6    to distinguish it from the other type of implied trust, the constructive or 'fraud-rectifying' trust,"

7    because "[t]he resulting trust carries out the inferred intent of the parties." *American Motorists Ins.*

8    *Co. v. Cowan*, 127 Cal. Rptr. 747, 752 (Cal. Ct. App. 1982) (quoting 7 WITKIN, SUMMARY OF

9    CAL. LAW, TRUSTS § 123, at 5481 (8th ed. 1974)). "A resulting trust arises by operation of law

10   from a transfer of property under circumstances showing that the transferee was not intended to

11   take the beneficial interest." *In re Garcia*, 92 F. App'x 486, 486 (9th Cir. 2004) (quoting *Lloyds*

12   *Bank Cal. v. Wells Fargo Bank*, 232 Cal. Rptr. 339, 341 (Cal. Ct. App. 1986)) (emphasis in

13   original omitted). The paradigm case is one in which a transfer of real property is made by one

14   person but the consideration thereof is paid by another. *See Walton v. Karnes*, 7 P. 676, 677 (Cal.

15   1885). Ordinarily, transactions where property is purchased with the funds of one person and

16   taken in the name of another give rise to a rebuttable presumption of resulting trust. *Browning v.*

17   *Evans*, 20 P.2d 681, 683 (Cal. 1933); *Lonely Maiden Prods., LLC v. GoldenTree Asset Mgmt., LP*,

18   135 Cal. Rptr. 3d 69, 84 (Cal. Ct. App. 2011). One exception to this presumption is a transaction

19   between parent and child wherein the child is the grantee, which is presumed to be a gift not

20   subject to resulting trust. *Quinn v. Reilly*, 245 P. 1091, 1092 (Cal. 1926). The parent-child gift

21   presumption is also rebuttable. *Id.* The party claiming a resulting trust must establish their

22   beneficial interest by clear and convincing evidence. *Gomez v. Cecena*, 101 P.2d 477, 478 (Cal.

23   1940).

24   Defendant moves for judgment on the pleadings, arguing that the resulting trust claim fails

25   as a matter of law because the Complaint does not allege that Defendant was not intended to take

26   the beneficial interest in the Hawaii property.[13] She also moves for summary judgment in her favor

27   

28   _____

     [13] Defendant also argues that the resulting trust claim is deficient because the Complaint "alleges that Patricia
     financed the purchase of the Hawaii home," but this contention mischaracterizes the Complaint and the

United States District Court
Northern District of California

1   for this reason. She additionally argues that the evidence is uncontradicted that Plaintiff's

2   $300,000.00 payment was a gift not intended to create a resulting trust. (Def.'s Mot., Dkt. 42, at

3   11–12.) In response, Plaintiff contends that a resulting trust can be established so long as

4   Defendant was not the sole intended beneficiary of the property and Susan and Michael intended

5   to reserve partial beneficial interest for themselves, and that there is significant evidence

6   contradicting the idea that Plaintiff intended to gift the downpayment to Patricia. (Pl.'s Opp., Dkt.

7   45, at 12–17.)

8          First, Plaintiff's intent for Defendant to have a beneficial interest in the property does not

9   defeat their resulting trust claim. Courts in this district and throughout California have routinely—

10  though not uniformly—found that a resulting trust could result where the grantor intended to

11  retain partial beneficial interest for themselves despite also intending to give a beneficial interest

12  to the grantee. *See Savin v. Kafka*, No. 17-30013 HLB, 2018 WL 6132506, at *10–12 (Bankr.

13  N.D. Cal., Nov. 21, 2008) (holding that the party listed on the title of a property held the property

14  in resulting trust with himself and two other parties each holding equitable one-third interests);

15  *Rowland v. Clark*, 206 P.2d 59, 60–61 (Cal. Ct. App. 1949) (finding that resulting trust applied to

16  property insofar as a life estate was intended for one of the parties on the title); *Lonely Maiden*

17  *Prods.*, 135 Cal. Rptr. 3d at 83–84 ("The transferee is said to hold the property, *in whole or in*

18  *part*, upon a resulting trust for the transferor. . . ." (quoting Restatement (Third) of Trusts § 7

19  cmt. a (A.L.I. 2003) (emphasis added)). *Contra Finnegan v. Hernandez*, 168 P.2d 32, 33 (Cal. Ct.

20  App. 1946) ("To constitute a resulting trust it must be shown that the grantee had no beneficial

21  interest."). Although there do not appear to be any cases in California that resolve whether intent

22  to reserve only partial interest for oneself on the part of the grantor can create a resulting trust,

23  _____

24  relevant law. (Def.'s Mot., Dkt. 40, at 6.) The Complaint does not include almost any details about how the
    financing of the house was acquired, except that it states in multiple places that Plaintiff contributed
    $300,000.00 towards the purchase of the property. (Compl. ¶ 39.) While these funds may have been first

25  given to Defendant, the Complaint is clear that the funds were transferred to her "in accordance with and
    reliance on the Agreement" for the purchase of the shared home. Money furnished to another with the

26  understanding that said money will be used to purchase joint property can give rise to a resulting trust. *See*
    *Madsen v. Madsen*, 170 P.2d 435, 436 (Cal. Ct. App. 1917). The Complaint thus sufficiently alleges at least

27  that Plaintiff paid a significant portion of the purchase price of the house, and these allegations are sufficient
    to state a claim, as "partial payment of the consideration for property may give rise to a resulting trust to the

28  extent of the payment." *Lloyds Bank Cal.*, 232 Cal. Rptr. at 342.

allowing for a resulting trust in such circumstances is the most reasonable and equitable outcome.[14] The mere fact that Defendant was intended to have *some* beneficial interest in the property is not fatal to Plaintiff's case where there is evidence of her intent to also reserve partial beneficial interest for herself and Michael. Plaintiff's Complaint clearly indicates that she intended to be on the title and preserve some beneficial interest for herself, and the evidence submitted with the summary judgment motions supports this allegation. (Compl. ¶¶ 13, 19, 23; *see, e.g.*, Patricia Dep. 78:3–5, 81:1–3 (acknowledging that she knew adding her parents to the title was "very important" and her mother "expected it"); Susan Dep. 18:20–19:6 (testifying that she asked about being added to the title).)

Next, Defendant argues that Plaintiff's $300,000.00 payment was a gift. In California, a transfer of personal property is a gift if it is made voluntarily and without consideration.[15] Cal. Civ. Code § 1146. The parties here primarily dispute Plaintiff's donative intent, as the transferor's intent at the time of the property transfer is the primary factor in the creation of a resulting trust. Defendant contends that the contemporaneous evidence overwhelmingly establishes Plaintiff's intent to make a gift and does not rebut the parent-child gift presumption through clear and convincing evidence. Defendant relies on the "gift letter" from the mortgage company, which

---

[14] This framework is common in treatises and in the application of resulting trusts in other states. *See* RESTATEMENT (THIRD) OF TRUSTS § 9 (2003) ("Where a person pays the purchase price and directs that property be transferred to another who is a natural object of the payor's bounty, and it is shown that the payor intended merely to have a partial interest in the property, a resulting trust arises in favor of the payor only as to that interest."); BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 462(b) ("an agreement to take a three-fourths interest in return for full payment of the price amounts to a rebuttal of the presumption of a trust for the payor as to a one-fourth interest in the land and a confirmation of the presumption of a trust as to an undivided three-fourths interest. . . . [This approach to an intent to take a lesser interest] seems the most reasonable and expedient."); *Larisey v. Larisey*, 77 S.E. 129, 130 (S.C. 1913) (South Carolina) ("the trust may be determined by such evidence, according to the actual intent of him who pays the purchase money at the time of the transaction, and limited, according to his intention at that time, either to a part of the property conveyed by the deed, or to a particular estate therein."); *Brinkley v. Patton*, 149 P.2d 261, 264 (Okla. 1944) (Oklahoma) ("although Neeley Brinkley paid the entire purchase price of the realty he did not intend to retain the entire beneficial interest. . . . Thus the Pattons held in trust for Brinkley a vested undivided half interest in an estate for the life of Brinkley").

[15] The following elements of a gift have been defined through caselaw: "(1) competency of the donor to contract; (2) a voluntary intent on the part of the donor to make a gift; (3) delivery, either actual or symbolic; (4) acceptance, actual or imputed; (5) complete divestment of control by the donor; and (6) lack of consideration for the gift." *United States v. Alcaraz-Garcia*, 79 F.3d 769, 775 (9th Cir. 1996).

Susan signed certifying that the transfer of funds was a gift to Patricia for purchasing the house;[16] an email from 2019 in which Susan told her tax advisor she wanted "to give" Patricia money for a house, and he wrote back that the transfer "would be a gift" and they would file gift tax returns; and a later email from Susan to Patricia in June 2021, wherein she expressed that she would not pay Patricia any part of the mortgage because "giving you $300,000 plus . . . for a house I have no legal interest in is enough."[17] (Def.'s Mot., Dkt. 48, at 3–4.) Plaintiff argues that the gift letter is not dispositive and that the majority of the evidence disproves donative intent on the part of Plaintiff, pointing to Patricia's email from June 2021 confirming that she originally intended to add her parents to the title; Patricia's admission that Susan contributed $300,000.00 to purchase the Hawaii property; an email from Susan in May 2020 asking if there would be any issues adding herself and Michael to the title, and the real estate agent responding that they will be added after closing for simplicity; Susan's contributions towards the repair and renovation of the house; and Susan's declaration and deposition statements indicating that she signed the gift letter at the advice of the mortgage or loan advisor but she still expected to be added to the title and live at the house. (Pl.'s Opp., at 16–17.)

First, Defendant's contention that the contemporaneous evidence uniformly suggests donative intent is not borne out by a review of the record. The emails sent around the time of purchase from Susan to the realty company requesting clarity as to whether there would be any issues adding the parents to the title indicate that, at the very least, Susan still planned or hoped on

---

[16] Although Defendant argues that the gift letter "conclusively" establishes that the downpayment was a gift, intent regarding resulting trusts should be determined through evaluation of the totality of the surrounding circumstances and the conduct of the parties. *See, e.g.*, *In re Cecconi*, 366 B.R. 83, 119–23 (Bankr. N.D. Cal. 2007) (finding lack of intent to impart beneficial interest through evaluation of circumstances beyond deed), *aff'd sub nom. Spicer v. Cecconi*, No. C 07-03636 JW, 2009 WL 10728764 (N.D. Cal. Aug. 24, 2009), *aff'd*, 413 F. App'x 976 (9th Cir. 2011) ("a [gift] presumption can be rebutted by parol evidence"). And, where an instrument like a gift letter does not represent an integrated contract, it is not controlling. *See In re Detiege*, No. 4:19-AP-08029-JMM, 2022 WL 843374, at *3–4 (B.A.P. 9th Cir. Mar. 22, 2022) (finding evidence that transfer was not a gift despite existence of gift letter under similar Idaho law).

[17] Defendant further argues that the contradictory evidence identified by Plaintiffs is entirely evidence created for this litigation, like depositions and declarations, that are less probative and do not create a question of material fact as to Plaintiffs' donative intent. However, Defendant cites no authority for this proposition and makes no further argument that this evidence should be considered differently than other evidence submitted. As such, this argument goes to the relative weight of the evidence; weighing the evidence is not the proper role of the court at the summary judgment stage.

being added to the title as part of the transaction. (Ex. A to Susan Decl., Dkt. 44-2.) Moreover, the parties' conduct may also be considered—courts have weighed evidence of a parent-grantor occupying, improving, and controlling a property when considering whether the grantor intended to retain beneficial interest for themselves. *See, e.g.*, *McCosker v. McCosker*, 265 P.2d 21, 23 (Cal. Ct. App. 1954) (evidence supporting parents' resulting trust included evidence that parents lived on and improved property); *Rowland*, 206 P. 2d at 61 (evidence that grantor intended to retain at least a life estate in property included her residency and use of funds for improvements); *Cf. Estate of Schechtman*, 328 P.2d 478, 481 (Cal. Ct. App. 1958) (considering evidence of parent-grantor's control over property and finding it insufficient to overcome gift presumption). Susan and Michael's decision to make substantial changes to the Hawaii property and live in the house for months is potential evidence of their intent to share an interest in and retain some control over the property, rather than outright gift the money to purchase the house to Defendant. Susan's testimony that she asked Patricia about being added to the title from the beginning and that her intent was to retain an interest in the property is also important evidence that is in conflict with Patricia's recollection of the understanding at the time of the purchase. This evidence is enough to create a triable issue of fact. Whether this conflicting evidence is clear and convincing such that the gift presumption is rebutted is a matter for the finder of fact to decide. *See Rollins v. Neilson*, 480 B.R. 299, 313 (Bankr. N.D. Cal. 2009) ("Intent is an inherently fact laden inquiry that does not lend itself to summary judgment."); *Rowland*, 206 P. 2d. at 60 ("While there must be clear and convincing proof to establish a trust, such proof may be indirect, consisting of acts, conduct and circumstances, the question whether the showing is clear and convincing being primarily one for the trial court [as the finder of fact]."). Thus, Defendant's motion for judgment on the pleadings and motion for summary judgment with respect to claim two for resulting trust are DENIED.

**Claim 3: Breach of the Implied Covenant of Good Faith and Fair Dealing**

"It is well settled that, in California, the law implies in *every* contract a covenant of good faith and fair dealing." *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 686 P.2d 1158, 1166 (Cal. 1984), *overruled on other grounds by Freeman & Mills, Inc. v. Belcher Oil Co.*, 900 P.2d 669 (Cal. 1995). The factual elements of a claim for breach of the covenant of good faith and

fair dealing in California are the following:

> (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct.

*Rosenfeld v. JPMorgan Chase Bank*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010). The covenant "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." *QuickLogic Corp. v. Konda Tech., Inc.*, 618 F. Supp. 3d 873, 886 (N.D. Cal. 2022) (quoting *Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089, 1110 (Cal. 2000)).

A breach of the implied covenant of good faith and fair dealing goes beyond a breach of the contract terms—although breach of the explicit terms is not necessary, the defendant's conduct must "demonstrate[] a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence by rather by a conscious and deliberate act." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387, 399–400 (Cal. Ct. App. 1990). "[W]here breach of an actual [contract] term is alleged, a separate implied covenant claim, based on the same breach, is superfluous." *Guz*, 8 P.3d at 1095. Thus, claims for breach of the implied covenant may be dismissed as superfluous to claims for breach of contract if they do not go beyond a breach of the contract terms and rely on the same factual allegations or seek the same damages. *Careau*, 272 Cal. Rptr. at 400.

Defendant argues that she is entitled to judgment on the pleadings as to the implied covenant because this claim is duplicative of the claim for breach of contract.[18] (Def.'s Mot., Dkt. 40, at 7 n.4; Def.'s Reply, Dkt. 46, at 5.) Plaintiff contends that the claims are distinct because the claim for breach of the implied covenant of good faith and fair dealing goes beyond a mere breach

---

[18] Defendant also argues that she should be granted judgment on the pleadings as to claim three because a claim for breach of the implied covenant of good faith and fair dealing is predicated on a pre-existing contractual relationship between the parties, *Spencer v. DHI Mortg. Co.*, 642 F.Supp.2d 1153, 1165 (E.D. Cal. June 30, 2009), and Defendant had previously demonstrated that there was no successful contract, (Def.'s Mot., Dkt. 40, at 7). Insofar as the court has found that Plaintiff has successfully pled a claim for breach of contract and alleged the existence of a contract, this argument is moot.

United States District Court
Northern District of California

of a contractual term, alleging that Defendant engaged in "intentional concealment and misrepresentation" that induced Plaintiff to spend substantial time and money on the property, and that such conduct constitutes dealing in bad faith sufficient to support a standalone claim. (Pl.'s Opp., Dkt. 45, at 19.)

Plaintiff has not properly pled a non-superfluous claim for breach of the implied covenant. Allegations of both breach of contract and breach of the implied covenant of good faith and fair dealing will often overlap in facts and remedies, as they typically arise out of the same set of circumstances; it is the job of courts to examine whether the claims can be distinguished despite this overlap and, if not, to find the breach of the implied covenant claim duplicative. *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 853 (C.D. Cal. 2004). Here, Plaintiff's breach of contract claim alleges that Patricia agreed to add her parents to the title of the property and add Michael as her dependent in exchange for the payment of the $300,000.00 and the cost of repairs and maintenance; that Susan and Michael made monthly payments of $5,000.00 to Patricia to spend down their savings based on her promise to add Michael as her dependent; that Patricia never added her parents to the title or added Michael as her dependent; and that Patricia failed to return any of the money paid in reliance on her promise to uphold the contract obligations. (Compl. ¶¶ 32–36.) Plaintiff requests relief in the form of damages not less than $10,000, interest at the maximum rate, and attorney's fees and costs. (Compl. ¶ 37.) Plaintiff's cause of action for breach of the implied covenant of good faith and fair dealing incorporates the same facts as the breach of contract claim, plus the following statement: "Patricia violated the covenant as described herein, as said conduct violates, nullifies, and/or significantly impairs the Murmans' benefit of the Agreement." (Compl. ¶ 49.) The Complaint then requests damages of not less than $10,000, interest at the maximum rate, and attorney's fees and costs. (Compl. ¶ 50.) The Complaint draws no distinction between the conduct constituting the breach of contract and the conduct underpinning the breach of the covenant besides a conclusory statement that Defendant's conduct violated the covenant. It asks for identical damages based on the same actions. The pleadings and claim contain no allegation that Defendant acted in bad faith to prevent Plaintiffs from being added to the title or that she acted in bad faith when she failed to add Michael as her dependent.

Plaintiff argues in her opposition that the breach of the implied covenant claim goes beyond the mere breach of contractual duties because she is alleging that Defendant made misrepresentations and intentionally concealed her intent not to perform her obligations and that Plaintiff relied on these misrepresentations to her detriment, and Defendant's alleged bad faith is enough to sustain a separate cause of action. This theory, however, is not alleged in the Complaint in any meaningful way. Moreover, the evidence submitted by the parties on summary judgment does not support this argument or give rise to the possibility that this claim might be distinguishable from the breach of contract claim.

Plaintiff points to no evidence whatsoever to show that Defendant's failure to add Michael as her dependent was anything more than negligence, mistake, or bad judgment. As for Defendant's failure to add her parents to the title of the house, Plaintiff argues that Patricia "engaged in intentional concealment and misrepresentation" by "making false assurances" and "failing to disclose her true intent to exclude them" from the title, which induced them to spend significant time and money on the property. (Pl.'s Opp., Dkt. 45, at 18–19.) Plaintiff identifies three pieces of evidence to support these contentions. First, she points to Patricia's deposition testimony:

> **Ms. Hanway:** Would you agree with me that you unilaterally decided that they were not going to be placed on the title?
> **Patricia:** After she threatened me, yes, I did.
> **Ms. Hanway:** I am not asking for a timeframe. Yes or no? Did you unilaterally decide?
> **Patricia:** Yes, I decided I was not going to pursue that.

(Patricia Dep. 157:3–16 (quotation altered).)[19] Plaintiff then points to a line from an email Patricia wrote to her mother in June 2021 that says, "I WAS having you added to the title, and had already started that process." (Dkt. 44-1, at 45) (emphasis in original). Finally, she points to Patricia's admission of the request for admission, "Admit YOU never undertook the necessary action(s) to place Plaintiffs on the title to the Hawaii Property." (Dkt. 44-1, at 56) (emphasis in original).

---

[19] The deposition quotation above omits the objections of defense counsel to the form of the two questions. Defense counsel has not raised these objections in the briefs nor provided any supporting argument that would warrant sustaining these two objections, and as such, the court does not address the objections.

United States District Court
Northern District of California

The evidence cited by Plaintiff does not establish any kind of misrepresentation or concealment. The request for admission only admits that Susan and Michael were never added to the title, which is undisputed; it does not establish that Patricia never actually began the process to add her parents or that she misrepresented her intent to undertake this process to Susan. The RFA admission also does not contradict Patricia's assertion in the email that she had begun the process of adding them to the title. Patricia's deposition statements are evidence that she made the deliberate decision not to add her parents to the title after a fight with her mother, but they say nothing indicating that she misrepresented or concealed this decision from Susan. This deliberate action might constitute sufficient evidence of bad faith to sustain a separate cause of action for breach of the implied covenant of good faith and fair dealing in some circumstances. However, this evidence does not distinguish the claims where, as here, there is no severability between the claims—if Plaintiff fails on her breach of contract claim, she will necessarily fail on her breach of implied covenant claim.

In this case, the parties do not dispute that Plaintiff was not added to the title of the Hawaii house and that Michael was not added to Defendant's health benefits as her dependent. The parties only dispute whether a contract existed imposing these obligations on Defendant such that her failure to carry out these promises constituted a breach of contract. Plaintiff alleges that Defendant had a contractual duty to add her and Michael to the title of the house—she does not allege the existence of any contract that did not give rise to this duty. Plaintiff's breach of contract claim would fail if it were found that there was no contract at all or that the contract formed did not obligate Defendant to add her parents to the title. In the first case, the lack of a contract would preclude recovery for breach of the implied covenant. In the second case, a contract which does not encompass Plaintiff's interest in the property would not be frustrated by Defendant's failure to transfer Plaintiff's property interest—for example, it is possible that the contract found is one where Plaintiff gave Defendant the capital for the house in exchange for Michael becoming her dependent, or where Plaintiff helped Defendant purchase the home with the expectation that the parents could live on the property. In either circumstance, both claims fail.

Moreover, if both claims succeed, there is nothing additional to be gained through the

breach of implied covenant of good faith and fair dealing. The requested damages are the exact same for both claims, and the recoverable damages under the contract are the exact same. As such, the claim for breach of the implied covenant adds nothing: it either fails as the breach of contract claim fails, or succeeds along with the breach of contract claim but would contribute only duplicative damages. *See Celador Int'l Ltd.*, 347 F. Supp. 2d at 853 ("Plaintiffs have distinguished their claims here. Plaintiffs allege that Defendants' actions breached the contract. If not, the actions, allegedly taken in bad faith, frustrated the actual benefits of the contract."); *Daly v. United Health Care Ins. Co.*, No. 10–CV–03032–LHK, 2010 WL 4510911, at *4–7 (N.D. Cal. Nov. 1, 2010); *Love & War LLC v. Wild Bunch A.G.*, No. CV 18-3773-DMG (PLAx), 2018 WL 7501286, at *3 (C.D. Cal. Dec. 21, 2018) ("both claims may proceed in a single action where the claimant may prevail on the breach of good faith claim notwithstanding a loss on the breach of contract claim."). Plaintiff has supplied enough evidence to create a triable issue of fact as to whether Defendant's failure to add Susan and Michael to the title was deliberate in bad faith, but either way the underlying conduct—not adding them to the title—is identical. While "bad faith" can be shown through the conscious and deliberate refusal to discharge contractual responsibilities, these bad faith actions must go beyond the breach of contract allegations and be able to succeed independently to support a separate cause of action under the implied covenant. *See, e.g.*, *Soundgarden v. UMG Recordings, Inc.*, No. LACV1905449JAKJPRX, 2020 WL 1815855, at *17 (C.D. Cal. Apr. 6, 2020); *Sacramento Cnty. Emps.' Ret. Sys. v. Telus Health (US) Ltd.*, No. 2:24-CV-01431-JAM-SCR, 2024 WL 4224990, at *2 (E.D. Cal. Sept. 18, 2024) (requiring allegations to both "constitute a conscious and deliberate act" and "go beyond the statement of a mere contract breach" to distinguish claims). Here, Plaintiff cannot state a successful claim for breach of the implied covenant without a successful breach of contract claim, and the underlying acts and requested relief are identical. She also has not supplied sufficient evidence indicating that the claims might be distinguishable.

The court has discretion whether to grant leave to amend, considering whether leave to amend would cause undue delay or prejudice to Defendant, if there have been previous amendments, if the claim is brought in bad faith, or whether amendment would be futile. *See*

1    *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).  Plaintiff cannot amend her Complaint to

2    successfully state a claim for breach of the implied covenant of good faith and fair dealing that is

3    not superfluous; because amendment would be futile, the court DISMISSES without leave to

4    amend claim three for breach of the implied covenant of good faith and fair dealing.

5    **Claim 4: Unjust Enrichment**

6         Under California law, a plaintiff making a claim for unjust enrichment must allege (1)

7    "receipt of a benefit" and (2) "unjust retention of the benefit at the expense of another." *Riganian*

8    *v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1094 (N.D. Cal. 2025); *accord Pro. Tax*

9    *Appeal v. Kennedy-Wilson Holdings, Inc.*, 239 Cal. Rptr. 3d 908, 915 (Cal. Ct. App. 2018). A

10   cause of action[20] for unjust enrichment is a quasi-contract claim; quasi-contract claims "cannot lie

11   where there exists between the parties a valid express contract covering the same subject matter."

12   *Berlanga v. Univ. of San Francisco*, 318 Cal. Rptr. 3d 782, 793 (Cal. Ct. App. 2024) (internal

13   citations and quotations omitted). Thus, "a plaintiff may not plead the existence of an enforceable

14   contract and maintain a quasi-contract claim at the same time, unless the plaintiff has pled facts

15   suggesting that the contract may be unenforceable or invalid." *Jacobs v. Sustainability Partners*

16   *LLC*, No. 20-CV-01981-PJH, 2020 WL 5593200, at *17 (N.D. Cal. Sept. 18, 2020) (quoting

17   *Schulz v. Cisco Webex, LLC*, No. 13-CV-04987-BLF, 2014 WL 2115168, at *5 (N.D. Cal. May

18   20, 2014)).

19        Defendant moves for judgment on the pleadings as to the unjust enrichment claim.

20   Defendant argues that, although Plaintiff may bring contradictory claims in the alternative, she has

21   not properly pled unjust enrichment because she failed to allege that the express contract was void

22   or unenforceable. Plaintiff's Complaint describes the terms of an "Agreement" that is explicitly

23   _____

24   [20] California courts are split on whether unjust enrichment is its own cause of action or whether it is a remedy
     for a quasi-contract claim for restitution. However, the Ninth Circuit has made clear that courts may

25   "construe" unjust enrichment claims as quasi-contract claims for restitution, and both federal and state courts
     have repeatedly allowed plaintiffs to proceed on "unjust enrichment" claims. *Astiana v. Hain Celestial Grp.,*

26   *Inc.*, 783 F.3d 753, 762 (9th Cir. 2015); *see also ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th
     Cir. 2016); *Beluca Ventures LLC v. Aktiebolag*, 622 F. Supp. 3d 806, 813–14 (N.D. Cal. Aug. 19, 2022)

27   ("governing Ninth Circuit case law makes clear that an unjust enrichment claim brought under California
     law may be construed as a quasi-contract claim seeking restitution."); *Rutherford Holdings, LLC v. Plaza*

28   *Del Rey*, 166 Cal. Rptr. 3d 864, 872 (Cal. Ct. App. 2014) (construing cause of action for unjust enrichment
     as a quasi-contract claim seeking restitution).

United States District Court
Northern District of California

1    alleged to be a "valid contract." (Compl. ¶ 30.) Nowhere in the Complaint does Plaintiff say that

2    the alleged contract is void or unenforceable or disclaim the existence of the contract altogether.

3    Moreover, the unjust enrichment claim incorporates the preceding allegations, including the

4    allegation that the parties entered into an enforceable and valid contract.[21]

5          While the Complaint does not state explicitly that the contract is invalid, Plaintiff does

6    allege facts that could call into question the enforceability of the contract, namely through

7    describing a contract which is unenforceable under the statute of frauds. While this is not enough

8    to save a pleading where an enforceable contract is explicitly alleged, some courts have allowed

9    such plaintiffs the opportunity to amend and make their alternative contentions more explicit. *See,*

10   *e.g.*, *Tsai v. Wang*, No. 17-CV-00614-DMR, 2017 WL 2587929, at *8 (N.D. Cal. June 14, 2017)

11   (dismissing unjust enrichment claim with leave to amend where complaint alleged express oral

12   contract without explicitly alleging in the alternative that the contract was unenforceable); *Saroya*

13   *v. Univ. of the Pac.*, 503 F. Supp. 3d 986, 999 (N.D. Cal. 2020) (precluding unjust enrichment

14   claim where claim "did not deny the existence or enforceability of the alleged enforceable

15   agreement"); *Culver Clinic Dev., Inc. v. Harms Software, Inc.*, No. CV218374DSFGJSX, 2022

16   WL 79832, at *11 (C.D. Cal. Jan. 7, 2022) (unjust enrichment claim failed where plaintiffs "failed

17   to plead the absence of an enforceable contract and instead incorporated[d] by reference all of the

18   preceding allegations"); *RBB2, LLC v. CSC ServiceWorks, Inc.*, No. 118CV00915LJOJLT, 2019

19   WL 1170484, *11–12 (E.D. Cal. Mar. 13, 2019) (finding that plaintiffs "must be precise in

20   pleading these alternative claims" and dismissing quasi-contract claim where it incorporated

21   previous allegations, which included allegations of enforceable agreement).

22         The court has discretion whether to grant leave to amend. *See Bonin*, 59 F.3d at 845. The

23

24   _____

25   [21] Plaintiffs are also not specific in the Complaint as to the "mistake, fraud, coercion, []request," or other
     wrongful conduct by Defendant that renders the retention unjust, beyond the fact of the retention itself.
26   *Russell v. Walmart, Inc.*, 680 F. Supp. 3d 1130, 1133 (N.D. Cal. July 5, 2023). If Plaintiffs intend to rely on
     allegations of fraud or mistake to ground their claim for unjust enrichment, they must meet the particularity
27   requirements of Rule 9(b). *See Puri v. Khalsa*, 674 F. App'x 679, 690 (9th Cir. 2017) ("Because the unjust
     enrichment claim is based on fraud, it too is subject to Rule 9(b)."); *In re Arris Cable Modem Consumer*
28   *Litig.*, No. 17-CV-01834-LHK, 2018 WL 288085, *10 (N.D. Cal. Jan. 4, 2018) (where unjust enrichment
     claim was based on allegedly misleading advertisements, it sounded in fraud and was subjected to Rule 9(b)).
     See the analysis of claim five *infra* for more on the potential for fraud-based claims in the Complaint.

United States District Court
Northern District of California

court finds that granting leave to amend is more reasonable than granting judgment on the pleadings here, especially because Defendant disputes the existence of the contract altogether. *Cf. Total Coverage, Inc. v. Cendant Settlement Servs. Grp., Inc.*, 252 F. App'x 123, 126 (9th Cir. 2007) ("[Plaintiff] does not allege that the contract is void, rescinded, or otherwise unenforceable, and [Defendant] agrees that the express contract governs the relationship between the parties. Under these circumstances, [Plaintiff] cannot plead alternative theories that necessarily fail where an express contract defines the rights of the parties."). Moreover, this is a simple, technical defect with the pleadings that should be straightforward to correct. The court therefore DISMISSES the claim for unjust enrichment and GRANTS Plaintiff leave to amend. Because the claim for unjust enrichment has been dismissed with leave to amend, the court does not reach the cross motions for summary judgment on this claim; both motions for summary judgment on claim four are DENIED but may be renewed should Plaintiff amend this claim.

**Claim 5: Financial Elder Abuse**

Finally, Defendant moves for judgment on the pleadings and summary judgment as to Plaintiff's claim for financial elder abuse under the California Welfare & Institutions Code Sections 15600 et seq., in particular Section 15657.5 and Section 15610.30. The Elder Abuse and Dependent Adult Civil Protection Act (hereafter "the Elder Abuse Act" or "the Act") defines financial elder abuse as follows:

> (a) "Financial abuse" of an elder or dependent adult occurs when a person or entity does any of the following:
> (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.
> (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.
> (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 15610.70.

Cal. Wel. & Inst. § 15610.30. "Wrongful use" is presumed if the person or entity "knew or should have known that [the] conduct is likely to be harmful to the elder or dependent adult." Cal. Wel. &

United States District Court
Northern District of California

Inst. § 15610.30(b). Taking or misappropriation occurs if an elder or dependent adult is "deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest . . ." Cal. Wel. & Inst. § 15610.30(c).[22] Undue influence is further defined as "excessive persuasion . . . overcoming [a] person's free will and result[ing] in inequity," considering the victim's vulnerability, the influencer's apparent authority, the influencer's actions or tactics, and the equity of the result. Cal. Wel. & Inst. § 15610.70. The Elder Abuse Act provides that defendants found liable for financial abuse will be liable for the plaintiff's attorney fees and costs in addition to compensatory damages and other remedies; if the defendant is also found guilty of "recklessness, oppression, fraud, or malice in the commission of the abuse" by clear and convincing evidence, the court may impose punitive or exemplary damages under California Civil Code Section 3294 and may award pain, suffering, and disfigurement damages to a successor-in-interest or representative of a decedent. Cal. Wel. & Inst. § 15657.5; Cal. Civ. Proc. Code § 377.34; Cal. Civ. Code § 3294.

Defendant first argues that financial elder abuse claims generally sound in fraud and must meet the heightened pleading standards of Rule 9(b), and judgment on the pleadings should be entered in her favor because the Complaint does not meet this heightened standard. First, Defendant mischaracterizes the elements of financial elder abuse—under the amended statute, financial elder abuse claims do not require fraud or fraudulent intent. Instead, claims may be

---

[22] The full text of the section reads as follows:

(b) A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult.

(c) For purposes of this section, a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder or dependent adult.

(d) For purposes of this section, "representative" means a person or entity that is either of the following:

(1) A conservator, trustee, or other representative of the estate of an elder or dependent adult.

(2) An attorney-in-fact of an elder or dependent adult who acts within the authority of the power of attorney.

brought if property is taken "for a wrongful use." Cal. Wel. & Inst. § 15610.30(a)(1). The only requirement for a showing of "wrongful use" under the statute is that the person knew or should have known that taking the property was "likely to be harmful" to the elder, which is distinct from a claim based in fraud. Accordingly, Rule 9(b) pleading standards do not apply in every case for financial elder abuse—only those whose basis sounds in fraud.[23] *See Guccione v. JPMorgan Chase Bank, N.A.*, No. 3:14-CV-04587 LB, 2015 WL 1968114, at *19 (N.D. Cal. May 1, 2015) (explaining that prior cases suggest that only financial elder abuse cases "grounded in fraud" might be subjected to the Rule 9(b) pleading standard); *Yokell v. Draper*, No. 18-CV-02124-JSC, 2018 WL 3417514, at *9 (N.D. Cal. July 13, 2018) ("Plaintiff need not plead fraudulent intent; allegations of wrongful use are sufficient" and not subject to particularity rules); *Wilson v. Gaver*, No. CV1600334BROGJSX, 2016 WL 3456987, at *6–7 (C.D. Cal. June 6, 2016) (distinguishing between fraud and wrongful use theories to establish adequacy of pleadings).

To properly plead a financial elder abuse claim, the Complaint must allege that (1) the defendant took property (2) from a California resident age 65 or older or from a dependent adult as defined in § 15610.23, (3) for a wrongful use or with intent to defraud, or both. Cal. Wel. & Inst. § 15610.30(b); *see Renner v. Bluegreen Corp.*, No. EDCV1600239JVSKKX, 2016 WL 10835981 (C.D. Cal. Aug. 15, 2016). Plaintiff has met this standard in her Complaint to the extent that she is alleging wrongful use. The Complaint identifies the property retained by Defendant as the

---

[23] Defendant cites to *Indian Harbor Insurance Co. v. Casa De Monte Vista, LLC*, for the proposition that "[a] claim for financial elder abuse must be pleaded with particularity, subject to the higher standard of Federal Rule of Civil Procedure 9(b) when litigated in federal court." No. CV 23-2019-DMG (SPX), 2024 WL 3468834, at *2 (C.D. Cal. June 20, 2024). To support this statement of law, the *Indian Harbor* court cites three cases. The first, *Carter v. Prime Healthcare Paradise Valley*, concerns elder abuse by medical professionals and finds that the plaintiffs had to state "specific factual allegations indicating at least recklessness." *Carter v. Prime Healthcare Paradise Valley LLC*, 129 Cal. Rptr. 3d 895, 905 (Cal. Ct. App. 2011), *as modified* (Aug. 24, 2011). *Carter* deals with claims under different sections of the Elder Abuse Act and does not speak to the requirements for stating a claim based on wrongful use. The other two cases, *Errico* and *Parducci*, are both federal cases where the district court applied the Rule 9(b) standards to a financial elder abuse case. However, the financial elder abuse claim in *Errico* was "essentially another fraud-based claim," hence the application of Rule 9(b), *Errico v. Pac. Cap. Bank, N.A.*, 753 F. Supp. 2d 1034, 1050 (N.D. Cal. 2010); the same is true for *Parducci. Parducci v. Overland Sols., Inc.*, 399 F. Supp. 3d 969, 979 (N.D. Cal. 2019) ("Because the Elder Abuse claim also sounds in fraud, it too is deficient under Rule 9(b)"). Because the cases on which *Indian Harbor* relies are either irrelevant to "wrongful use" claims or support the contention that only fraud-based elder abuse claims require particularity, the court declines to follow *Indian Harbor*'s overly broad statement of the particularity requirements for pleading financial elder abuse in federal court.

United States District Court
Northern District of California

1  $300,000.00 downpayment and the money used to improve the property; lays out the facts

2  establishing that both Susan and Michael fell within the statutory definition of elder or dependent

3  adult at the time of the taking and/or retaining of the property; and alleges that Defendant should

4  have known that this would harm her parents because they asked for the return of the money and

5  were "struggling financially." (Compl. ¶¶ 25–28, 57, 62.) This is enough information to allege the

6  elements of financial elder abuse under the statute. To the extent that Plaintiff is bringing a claim

7  based on Defendant's "wrongful use" of the property, the pleadings are sufficient to state a claim

8  and the heightened standards for particularity do not apply.

9           However, to the extent that Plaintiff's financial elder abuse claim is alleging fraud or intent

10  to defraud, the pleadings must meet the Rule 9(b) standards for specificity and set forth the time,

11  place, and content of the alleged representation, and the circumstances indicating falseness. Fed.

12  R. Civ. P. 9(b); *see also In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 (9th Cir. 1994),

13  *superseded by statute on other grounds*; *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th

14  Cir. 2003) (Rule 9(b) applies to state law claims that sound in fraud, and allegations of fraud must

15  include "the who, what, when, where, and how" of the misconduct (quoting *Cooper v. Pickett*, 137

16  F.3d 616, 627 (9th Cir. 1997))); *Wilson*, 2016 WL 3456987, at *6 (analyzing whether the

17  complaint met the Rule 9(b) particularity requirements "to the extent Plaintiff relies on a theory of

18  fraud to establish financial elder abuse"); *Heredia v. Sunrise Senior Living LLC*, No.

19  818CV01974JLSJDE, 2019 WL 5149854, at *4 (C.D. Cal. Mar. 4, 2019) (applying Rule 9(b)

20  where the financial elder abuse claim is "essentially another fraud-based claim." (quoting *Errico v.

21  Pac. Cap. Bank, N.A.*, 753 F. Supp. 2d 1034, 1050 (N.D. Cal. 2010))). The barebones facts alleged

22  in the Complaint do not meet the requirements of Rule 9(b) for particularity. The Complaint

23  alleges the following: that the parties agreed that they would all be on the title to the property; that

24  the title company did not add Susan or Michael to the title despite knowing about their agreement;

25  that Patricia continually promised to add her parents to the title; that Patricia told her parents they

26  needed to pay down their assets in order to become her adult dependents; that "it became clear" to

27  Susan that Patricia would not deliver on the promise to abide by the alleged agreement; that based

28  on this realization, Susan and Michael left the property without either promise being fulfilled; and

40

that Patricia did not pay back the initial downpayment amount upon request. These facts indicate the individuals involved and the content of the alleged misrepresentations made by Patricia, but they are insufficient with respect to the "when, where, and how" of the alleged misconduct. Nothing specific can be gleaned from the statement "Patricia continually promised" as to when these promises occurred, the medium by which these promises were made, or the number of promises made.[24] This is inadequate under Rule 9(b).[25] *See, e.g.*, *T & M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 880 (N.D. Cal. 2015) (requiring information about the medium by which statements were made (email, phone, in person, etc.) and requiring information about the timing of the alleged representations to satisfy Rule 9(b)); *Harvey v. Bank of Am., N.A.*, 906 F. Supp. 2d 982 (N.D. Cal. 2012) (holding that identifying "the thrust of what was said and in what month it was said" does not satisfy Rule 9(b)).

---

[24] In her claim for breach of contract, Plaintiff states that "Patricia agreed to add Susan and Michael to the Property's title upon Susan's payment of $300,000.00 cash, plus the costs of the repairs and maintenance to the Property." (Compl. ¶ 32.) While this seems to indicate the timing of the promise, the rest of the Complaint renders this statement as uncertain and unspecific as the other factual allegations. First, it is not clear whether this statement means that, at the time Susan paid the downpayment and repair costs, Patricia agreed to add her parents to the title sometime in the future, or that Patricia agreed sometime earlier that she would add Plaintiffs to the title when Susan contributed the $300,000.00 and other costs. Second, along with this statement, the Complaint says that Patricia promised to add her parents to the title "prior to and after the closing of the Property"; however, it is not clear how this promise or agreement could be made before closing when it was not yet apparent that Susan and Michael were not on the title and the title company was responsible for the title additions at that point. (Compl. ¶¶ 16–19.) Moreover, the statement implies that the promise to add Plaintiffs to the title was in part made in exchange for Plaintiff's agreement to pay for the repairs and maintenance, which is not supported by any other allegation in the Complaint. The minimal statements in the Complaint are too unclear and uncertain to satisfy the particularity requirements of Rule 9(b). *See First Advantage Background Servs. Corp. v. Priv. Eyes, Inc.*, 569 F. Supp. 2d 929, 944 (N.D. Cal. 2008) (finding that internally inconsistent allegations as to the timing of a statement were not sufficient to satisfy the "when" requirement under Rule 9(b)).

[25] In some cases, courts have found that general allegations as to the approximate timing of promises or misrepresentations are sufficient to satisfy the particularity requirements of 9(b). *See, e.g.*, *Philips Med. Cap., LLC v. Med. Insights Diagnostics Ctr., Inc.*, 471 F. Supp. 2d 1035, 1044 (N.D. Cal. 2007) (finding that Rule 9(b) was satisfied where the Complaint alleged "the approximate time frame as to when [the misrepresentations] were made"); *Lewis v. Ford Motor Co.*, 655 F. Supp. 3d 996, 1001 (E.D. Cal. 2023) (plaintiff satisfied the "when" through alleging the fraudulent omissions were made "at the time of sale and thereafter"). However, generalized allegations as to timing were appropriate in those cases because the generalizations were enough to put the defendants on notice as to the contested conduct and allow investigation of claims. *See Lucas v. Int'l Bus. Machines Corp.*, No. 20-CV-00141-JCS, 2020 WL 4569461 (N.D. Cal. Aug. 7, 2020) (finding that plaintiff did not need to allege specific dates where complaint contained enough information for defendant to investigate the claims and prepare defense). The broad timeframe Plaintiff alleged in this case is not sufficient here, where Plaintiff is claiming that Defendant's promises were false at the time they were made, and the timing is critical to determining the falsity of the statements.

The Complaint also does not properly allege the falsity of the representations because it does not make any allegation as to Patricia's knowledge or intent. Rule 9(b) does not apply to "malice, intent, knowledge, and other condition of mind." Fed. R. Civ. P. 9(b). As such, Plaintiff does not have to allege facts giving rise to a strong inference of fraudulent intent but may simply state Defendant's intent or knowledge alongside the particularized allegations of fraudulent conduct. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1545–47 (holding that, under Rule 9(b), plaintiffs may aver scienter generally by saying that scienter existed; that is, by stating that defendant had knowledge of material falsity). However, Plaintiff's Complaint does not include even a conclusory statement of Defendant's intent or knowledge, and the facts as alleged are too broad and unspecific to give rise to a plausible inference of fraudulent intent or knowledge of falsity beyond mere speculation. At most, the Complaint alleges that Defendant "failed or refused" to add her parents to the title or add Michael as her dependent, which does not imply that Defendant made false promises or statements with the knowledge of their falsity.[26] *See Smith v. Allstate Ins. Co.*, 160 F. Supp. 2d 1150, 1152 (S.D. Cal. 2001); see also *Tenzer v. Superscope, Inc.*, 702 P.2d 212, 219 (Cal. 1985) ("[S]omething more than nonperformance is required to prove the defendant's intent not to perform his promise." (quoting *People v. Ashley*, 267 P.2d 271, 282 (Cal. 1954))).

In their opposition to Defendant's motion, Plaintiffs argue that they adequately pled that Defendant made "false promises" to share title to the property and misrepresented or concealed her true intentions "during the transaction and renovations," satisfying the "when" and "how" requirements of Rule 9(b). (Pl.'s Opp., Dkt. 45, at 21–22.) But this argument only emphasizes the insufficiency of the Complaint insofar as Plaintiffs aver fraud, because these statements are not found in the Complaint itself. The Complaint does not include even conclusory statements that Defendant engaged in "false representation," "concealment," or "misrepresentation," nor does it

---

[26] From the facts as stated in the Complaint, it is equally possible that Defendant accurately stated the requirement that her parents needed to pay down their assets in order to become dependents and that her parents never achieved the requisite income level before they decided to leave the property, or that Defendant intended to add her parents to the title but through negligence or incompetence was unable to complete that process before they left the property.

allege Defendant's "true intentions." (Pl.'s Opp., Dkt. 45, at 21–22.) The statement of fact

describing Susan's apparent realization that Patricia did not intend to abide by the alleged

agreement does not state or imply that she was correct as to Patricia's intentions, and the fact that

Patricia did not return the funds provided to her "pursuant to the Agreement" is not enough to give

rise to an implication or inference of wrongdoing and knowledge of falsity. Any allegation of

misrepresentation, false promises, or concealment based on the Complaint alone is mere

speculation that is not plausibly inferable from the facts nor pled with specificity. To the extent

that Plaintiff is bringing a financial elder abuse claim under fraud or fraudulent intent, she has not

properly pled her Complaint with particularity as required by Rule 9(b).[27]

Plaintiff also argues that she has sufficiently pled a claim for financial elder abuse under

undue influence. Cal. Wel. & Inst. § 15610.30(a)(3). Undue influence does not need to be pled

with particularity—the Complaint need only contain some information supporting undue influence

that does not constitute a bare recital of the elements of a claim. However, undue influence

predicated on fraud must be pled with particularity, the same as any other claim grounded in fraud.

Plaintiff pled some facts to state a claim for financial elder abuse under a theory of undue

influence: (1) she alleged her age, Michael's illness, and her difficulty caring for him, which go

towards their vulnerability, (Compl. ¶¶ 7, 20); (2) she alleged the familial relationship between

Patricia and her parents, which may show Defendant's apparent authority, (Compl. ¶ 20); and (3)

she alleged the inequity of the result through assertions of the negative economic consequences

that resulted from spending money on the house and making other payments, (Compl. ¶¶ 24, 25).[28]

---

[27] While Plaintiff does not specifically argue in the briefing that she brings any claims based on fraud, many of her allegations and claims are essentially based on fraud and it is appropriate to analyze the Complaint on that basis. Plaintiff contends throughout the briefing that Defendant repeatedly promised to perform her obligations under the alleged agreement with no intent to actually perform, that Defendant repeatedly misrepresented her actions in compliance with the agreement or concealed her lack of action from Plaintiff, and that Defendant made these misrepresentations with the intent to defraud Plaintiff and induce her reliance. In California, fraud has the following elements: (1) a false representation (misrepresentation), concealment, or nondisclosure; (2) knowledge of falsity; (3) intent to defraud; (4) actual and justifiable reliance; and (5) resulting damages. *Small v. Fritz Cos.*, 65 P.3d 1255, 1258 (Cal. 2003). False promise, or promissory fraud, is a subspecies of fraud that is actionable "where a promise is made without such intention [to perform]." *Lazar v. Superior Ct.*, 909 P.2d 981, 985 (Cal. 1996).

[28] Under Section 15610.70, undue influence is determined through considering the following: the vulnerability of the victim, the influencer's apparent authority, the actions or tactics used by the influencer,

43

However, the allegations regarding Patricia's "actions or tactics" are less clear.[29] As explained above, the only actions the Complaint attributes to Patricia are promising to add her parents to the title and promising to add Michael as her dependent; telling her parents they needed to pay down their assets to be her dependents; accepting payments from Susan, which she made in reliance on these statements; and failing to honor said promises before her parents left and failing to pay back the money later. Nothing from these facts indicates excessive persuasion that overcame Susan's will. To the extent that Plaintiff argues that Patricia "misrepresent[ed] intent to share ownership" and accepted the payments under "false pretenses," these allegations sound in fraud and are insufficiently pled as described above. Without proper allegations of Defendant's fraudulent promises, the Complaint fails to state a claim based on undue influence.

Plaintiff additionally requests punitive damages because Defendant's conduct rose to the level of "recklessness, oppression, fraud, and malice" under § 15657.5(b). As discussed above, Plaintiff has not sufficiently stated a claim averring fraud. "Oppression, fraud and malice involve intentional, willful, or conscious wrongdoing of a despicable or injurious nature." *Carter v. Prime Healthcare Paradise Valley LLC*, 129 Cal. Rptr. 3d 895, 902 (Cal. Ct. App. 2011) (quotation altered).[30] Recklessness is "a subjective state of culpability greater than simple negligence" that rises to the level of "a conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it." *Doe v. Kachru*, 338 Cal. Rptr. 3d 1, 31 (Cal. Ct. App. 2025) (internal citations and quotations omitted).

---

and the equity of the result. Cal. Wel. & Inst. § 15610.70(a).

[29] Section 15610.70 includes a nonexclusive list of ways that plaintiffs may show the tactics or actions by which the influencer used undue influence. These tactics include controlling the necessaries of life (like medication, sleep, interaction with others, or access to information); use of affection, intimidation, or coercion; and initiation of changes in property rights, use of haste or secrecy in effecting those changes, effecting changes at inappropriate times or places, and claims of expertise in making changes. Cal. Wel. & Inst. § 15610.70(a)(3)(A)–(C). None of the factual allegations allege that Patricia utilized any of these possible tactics.

[30] "Malice is 'despicable' conduct of the defendant with a 'willful and conscious disregard of the rights or safety of others.' Oppression is 'despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.' Fraud is 'an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.'" *Nieves v. JP Morgan Bank, N.A.*, No. C 11-05260 WHA, 2012 WL 2873630, at *2 (N.D. Cal. July 12, 2012) (quoting Cal. Civ. Code §§ 3294(c) (1)-(3)).

United States District Court
Northern District of California

1   Malice, oppression, and recklessness all involve intentionality and knowledge; they are

2   exempted from the Rule 9(b) pleading standards, yet Plaintiff has failed to allege any facts related

3   to Patricia's intent or knowledge beyond the unfulfilled promises and the refusal to return the

4   down payment. The court explained above that the Complaint does not allege even general

5   statements about Defendant's knowledge, motive, or state of mind, only the legal conclusion that

6   she was "guilty of recklessness, fraud, oppression, and malice." (Compl. ¶ 64.) All of the elements

7   invoked in § 15657.5(b) require egregious and willful conduct, which has not been adequately

8   pled. The facts alleged as recited above do not rise above mere speculation to create a plausible

9   inference of recklessness, malice, oppression, or fraud under the basic federal pleading standards.

10  As such, Plaintiff has successfully stated a claim for financial elder abuse based on the

11  Defendant's wrongful use, but she has not successfully stated a claim for financial elder abuse

12  based on fraud or undue influence or stated a claim for punitive damages based on recklessness,

13  malice, fraud, or oppression. Plaintiff may amend her claim if she wishes to pursue financial elder

14  abuse claims under a theory of fraud or undue influence or to pursue the enhanced remedies

15  available under § 15657.5(b) and § 3294. Because the claim may proceed under wrongful use,

16  Defendant's Motion for Judgment on the Pleadings as to claim five is DENIED. Because Plaintiff

17  and Defendant have proffered evidence from which contradictory inferences can be drawn

18  regarding Patricia's intent and knowledge as described throughout this Order, and because

19  Patricia's intent and knowledge are the primary dispute behind the claim for financial elder abuse,

20  summary judgment is inappropriate. *See Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531

21  (9th Cir. 1985) ("Questions involving a person's state of mind, e.g., whether a party knew or

22  should have known of a particular condition, are generally factual issues inappropriate for

23  resolution by summary judgment."); *SEC v. Seaboard Corp.*, 677 F.2d 1297, 1298 (9th Cir. 1982)

24  ("Where intent is a primary issue, summary judgment is generally inappropriate."). Defendant's

25  Motion for Summary Judgment is DENIED, but may be renewed should Plaintiff amend this

26  claim.

27  CONCLUSION

28  Overall, the parties have demonstrated that they have entirely opposite recollections of the

45

1  events at the center of this case, and they have drawn contradictory inferences from the facts

2  presented. Moreover, they primarily dispute each other's intentions, knowledge, and

3  understanding over the course of the events at issue. These circumstances are generally not

4  appropriate for summary judgment—the parties will need to present their versions of the events to

5  a jury for a final decision on the credibility and weight of their "differing versions of the truth."

6  *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

7        For the reasons stated herein, Defendant's Motion for Judgment on the Pleadings is

8  **DENIED** as to the claims for breach of contract, resulting trust, and financial elder abuse (under

9  wrongful use), and **GRANTED** as to claims three and four. As such, the claim for breach of the

10  implied covenant of good faith and fair dealing is **DISMISSED without leave to amend**, and the

11  claim for unjust enrichment is **DISMISSED with leave to amend**. Defendant's Motion for

12  Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment are **DENIED**.

13        Plaintiff shall have fourteen (14) days from the entry of this order to file an amended

14  Complaint. If desired, Defendant shall file responsive pleadings no later than fourteen (14) days

15  after the filing of the amended Complaint. If the responsive pleadings are motions, Plaintiff's

16  response shall be filed no later than seven (7) days from the filing of the motions. Replies are not

17  allowed.

18

19        **IT IS SO ORDERED.**

20  Dated: December 19, 2025

21

22

23  ROBERT M. ILLMAN
    United States Magistrate Judge

24

25

26

27

28

46