UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

|  |  |
|---|---|
| SUSAN MURMAN,<br><br>         Plaintiff,<br><br>    v.<br><br>PATRICIA MURMAN,<br><br>         Defendant. | Case No.  24-cv-01439-RMI<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 59 |

The court recently denied the cross motions for summary judgment, partially granted Defendant's motion for judgment on the pleadings, and allowed Plaintiff to file an amended complaint. (Order, dkt. 55.) Plaintiff filed a First Amended Complaint ("FAC") pursuant to the court's Order. (Dkt. 56.) Now pending before the court is Defendant's Renewed Motion for Partial Summary Judgment. (Dkt. 59.) Plaintiff has filed a response, (dkt. 60), and the motion is ripe for a decision.[1]

## BACKGROUND

1. *Factual Background*[2]

This matter involves a family dispute over a failed attempt at sharing a home and healthcare benefits that resulted in parents Susan and Michael Murman suing their daughter

---

[1] The court's Order (dkt. 55) permitted renewed motions if Plaintiff filed a FAC but did not permit replies.

[2] The court recently described the facts of this case in detail. (Order on Cross Mots. Summ. J. & Def.'s Mot. J. Pleadings, Dkt. 55, Dec. 19, 2025.) As Defendant has not submitted any new evidence with her renewed Motion for Partial Summary Judgment, the court will undertake an abbreviated account of the facts here and otherwise incorporates the full description from the prior Order.

United States District Court
Northern District of California

Patricia Murman.[3] Before delving into the substantive background, the court notes that the record in this case is primarily composed of two types of evidence: barebones documents like receipts and testimonial evidence of the parties' subjective accounts. The record demonstrates that Patricia and Susan have conflicting and contradictory recollections of the relevant time period—these opposite experiences are reflected in the record all the way back to their contemporaneous email exchanges. The objective evidence does not resolve their differences, which revolve around their respective intentions, knowledge, and states of mind. Considering the state of the record as set forth above, the court turns to the factual background.

Michael suffered from a traumatic brain injury in 2016 and then developed dementia, and by 2018 he required round-the-clock care. (Susan Decl. ¶ 2, Dkt. 44-2.) Sometime in late 2018 or early 2019, Patricia spoke with her mother about the possibility of adding Michael to her health insurance as a dependent adult, which would require her parents to move to Hawaii where she was stationed with the U.S. Army. (Dkt. 44-1, at 18.) In September 2019, after months of discussion, Susan and Michael agreed that becoming Patricia's dependents was a good idea and they began to discuss the details of purchasing a house to share in Hawaii. (Dkt. 1-7, at 30.) Around the same time, Susan emailed her accountant asking about taxes on the money she wanted Patricia to use for a downpayment, and he responded that they would file gift tax returns with no payable tax and that Patricia would not be taxed on the gift. (Ex. 2 to Def.'s Opp., Dkt. 47-1, at 6.)

The plan for the purchase of the house evolved until eventually it was decided that Patricia would be the only one to take out a loan because she got the best interest rate through the military, but her parents would provide the downpayment. (Dkt. 1-4, at 46–48; Patricia Dep. 79:1–80:23, May 29, 2025, Dkt. 44-1.) After Susan and Michael sold their house in California, Susan wired $400,000.00 to the escrow company, of which $300,000.00 were ultimately used for the downpayment on the Hawaii house. (Dkt. 44-1, at 25; Susan Dep. 16:22–23, June 24, 2025.) To

---

[3] The court will refer to Plaintiff and Defendant using their first names throughout the opinion to avoid confusion, as is customary for intra-family disputes. Although Michael is also the name of Patricia's husband, all references to "Michael" in this Order are to Michael Murman unless otherwise specified. Michael Murman passed away while this litigation was ongoing—the court thus refers only to Plaintiff, singular, even though Susan is now both representing her own claims and carrying forward Michael's claims.

send the money, Susan signed a gift letter certifying that the transfer of the funds to be used towards the Hawaii home was a gift. (Dkt. 44-1, at 28.) The downpayment reduced the mortgage. (Patricia Dep. 178:4–6.)

At the time of the loan processing, Patricia learned that it would be easier under Hawaii law for the title of the property to be in her name only, and for her parents to be added after closing—Patricia later testified that she was concerned about this process. (Patricia Dep. 74:9–75:3.) Susan was informed by email on May 7, 2020, that only Patricia would appear on the title at first for simplicity, and Susan responded asking if there would be any issues adding them to the title later.[4] (Ex. A to Susan Decl., Dkt. 44-2, at 7.) According to Patricia, she never had a discussion with her mother indicating that the downpayment was made in exchange for her parents' addition to the title, and most of the conversation about the downpayment happened between her mother and the real estate agents. (Patricia Dep. 176:2–177:20.)

Though Patricia did not believe that adding her parents to the title was the crux of their agreement to help purchase the property, she thought "[her] mother expected it." (Patricia Dep. 80:21–81:3, 175:1–8.) She stated that when they closed on the house it was her intention to add her parents to the title, and that she followed the advice of the loan advisor that it would be better to wait until after filing her taxes to add her parents. (Patricia Dep. 74:21–75:3, 76:17–77:6, 179:1–10.) She testified that at some point she downloaded the forms and began to fill them out.[5] (Patricia Dep. 77:13–16.) Her priority, however, was adding her parents as her dependents.[6]

---

[4] Susan testified at her deposition, however, that she was "very surprised" to see that she and Michael were not on the title after closing and that she was not given a good reason for this omission. (Susan Dep. 18:12–19.)

[5] Susan remembered asking Patricia about being added to the title and Patricia responding that she was working on the paperwork. (Susan Dep. 19:1–6.) She also said that Patricia told her about the advice to wait until after taxes, and then she asked Patricia again about being added to the title after taxes had been filed. (Susan Dep. 19:16–25.)

[6] In June 2021, Patricia wrote an email to her mother where she said that the dependency was her priority and had required significant work for which she was unprepared. (Dkt. 44-1, at 45.) On November 19, 2020, Patricia received a letter that her application to have her parents be her dependents was not approved because "dependent's income is more than half of the dependent's monthly expenses." (Ex. I to Patricia Decl., July 28, 2025, Dkt. 42-2, at 4.) Susan believed that Patricia tried to file the dependency applications with the intention of adding them as dependents, but that she did not research the requirements. (Susan Dep. 36:6–11.) Patricia said that the only thing left to accomplish before she left Hawaii in April was an update to her

3

While they lived in the Hawaii home,[7] Susan and Michael paid for a variety of home repair and renovation projects totaling $94,233.33. (Ex. B to Susan Decl., Dkt. 44-2; Susan Decl. ¶ 14, Dkt. 44-2.) The payments covered such items as roof repairs, plumbing, retaining walls and concrete for a patio, lumber, contractor services, and pest control. (Ex. B to Susan Decl., Dkt. 44-2.) Susan and Patricia disagree as to how the improvements were made and who was in charge. Patricia alleges that she told her mother to wait and that she could not afford the changes, and that she was not consulted as to any of the repairs or improvements, many of which occurred while she was at work. (Dkt. 44-1, at 45; Patricia Dep. 154:18–19, 155:18–21.) Susan, on the other hand, contends that Patricia knew about and directed the major repairs and induced her mother to pay for them through promising to add her and Michael to the title. (Dkt. 44-1, at 47; Susan Decl. ¶ 15, Dkt. 44-2.)

While Susan and Michael lived in Hawaii, Susan wrote sixteen checks to Patricia totaling $45,300.00: $10,000.00 for the J-1 and other incidentals associated with closing on the house; $20,000.00 for an engagement present; $4,000.00 for Patricia's fees for four board exams; and $11,300.00 for the parents' share of utilities, groceries, and living expenses.[8] (Patricia Dep. 103:7–16, 112:5–19; Susan Decl. ¶ 16, Dkt. 44-2.)

In February 2021, Patricia received orders to deploy to Korea, which meant she would no longer receive a housing subsidy in Hawaii. (Patricia Decl. ¶ 17, Dkt. 47-2.) In March 2021, Susan learned about the upcoming change in duty station; Susan and Patricia later had an interaction that Patricia described as a "verbal argument" in which Susan "erupted" and was "yelling" at her, (Patricia Decl. ¶ 18, Dkt. 47-2; Patricia Dep. 77:17), and that Susan described as "a frank discussion laying out the facts of what I knew," (Susan Dep. 43:6–9). Patricia decided she "was not going to pursue" adding her parents to the title on her own sometime after this argument.

parents' financial situation so they could qualify. (Dkt. 44-1, at 45.)

[7] They closed on the property on or around July 4, 2020; the payments were made between April 2020 and September 2021. (Def.'s Mot., Dkt. 42, at 10; Ex. B to Susan Decl., Dkt. 44-2.)

[8] Susan claims that some of the $11,300.00 was intended to go towards the mortgage payments, while Patricia says that at no point did her parents contribute to the mortgage payments nor tell her that the checks were intended to cover the mortgage. (Susan Decl. ¶ 16, Dkt. 44-2; Patricia Decl. ¶ 14, Dkt. 47-2; Patricia Dep. 106:7–107:5.)

4

United States District Court
Northern District of California

(Patricia Dep. 157:12–16.) She had made this decision by June 2021. (Patricia Dep. 175:14–176:1.)

Patricia left for duty training in April 2021 and deployed to Korea in May 2021. (Patricia Decl. ¶ 19.) Without the housing subsidy, Patricia could not afford the mortgage and asked her mother to help her with payments; her mother refused, and Patricia said she would rent out the house after her parents had departed in order to afford it. (Dkt. 44-1, at 48.) In response, Susan emailed Patricia that "as far as giving you more money for utilities and house payment I think giving you $300,000.00 plus, a new roof, huge patio and landscaping for a house I have no legal interest in is enough." (Dkt. 44-1, at 47.) Susan and Michael left Hawaii for Idaho in September 2021. (Ex. C to Susan Decl., Dkt. 44-2, at 43.) When she left, Susan told Patricia to pay her $300,000.00 after she sold the house. (*Id.* at 44.) Patricia later sold the Hawaii house for $1,700,000.00, of which she received $723,499.16. (Ex. C to Susan Decl., Dkt. 44-1, at 51.) Patricia testified that she used the majority of the proceeds from the sale of the Hawaii home to make a downpayment on a new house in North Carolina. (Patricia Dep. 183:14–185:13.)

In an email to Patricia in February 2022, Susan mentioned that the Hawaii house had sold a month earlier and that Patricia's fiancé "told me that you agreed to give [the $300,000.00] back to me when the house sold," and she asked if Patricia planned on keeping the money instead. (Ex. C to Susan Decl., Dkt. 44-2, at 45.) In another email from the same exchange, Susan referenced multiple payments she had made for Patricia and her payments for the home repair, told Patricia that she would file elder abuse charges against her if she did not return the money, and said she was paying $6,000.00 a month to house Michael in an assisted living facility and needed the money for another house. (*Id.* at 49.) Patricia wrote back that "threatening to file false charges for abuse against me is completely and totally unacceptable," and that she would never have accepted the money from her mother if she had known Susan later use it as "leverage." (*Id.*) She also wrote that if her mother planned on filing an elder abuse claim, she would no longer attempt to communicate with her. (*Id.* at 51.) This claim followed.[9]

---

[9] Susan and Michael first filed these claims in Idaho state court on February 17, 2023, (Dkt. 1-4, at 31–38); after Patricia moved to dismiss for lack of personal jurisdiction, they voluntarily dismissed the claims without

*2. The Updated Claims in the FAC*

The FAC contains four causes of action: (1) breach of contract, (2) resulting trust, (3) unjust enrichment, and (4) elder abuse. Claim Three for unjust enrichment alleges that Susan and Michael agreed to move to Hawaii in order to become Patricia's dependents for medical purposes, and that their financial contribution to the house "was coerced through the representation that they would be provided with an ownership interest in the Property after closing and that they would be residing at the Property during their retirement for many years to come." (FAC ¶¶ 51, 55.) Plaintiff also alleges that she and Michael contributed the $94,233.33 for home repairs in reliance on Patricia's representations that they would be added to the title. (FAC ¶¶ 61–62.) Plaintiff was never added to the title and eventually moved out of the house with Michael because of their "financial circumstances," according to the FAC. (FAC ¶¶ 29, 64.) After selling the house for $1,700,000.00, Patricia did not respond to Susan's requests to return their financial contribution; as such, the claim alleges that Patricia was unjustly enriched at Plaintiff's expense by at least $394,233.33, and requests relief in the form of the return of such sums plus the maximum interest rate and attorneys' fees and costs. (FAC ¶¶ 65 – 71.)

Plaintiff's Claim Four is for financial elder abuse under California Welfare and Institutions Code § 15600 *et seq*. It alleges that Susan and Michael contributed the $300,000.00 downpayment and the $94,233.33 in repairs based on Patricia's "false promise" to add them to the title of the house. (FAC ¶¶ 76–77.) It further alleges that Susan and Michael paid Patricia $5,000.00 a month based on her representation that they needed to spend down their assets to become dependents, and that she kept these contributions under the "false pretense" that she would add her parents to the title. (FAC ¶¶ 78–79.) Susan and Michael "trusted their daughter" and had no reason to believe she would not add them to the title or add them as dependents. (FAC ¶ 81.) Elsewhere, the FAC also states:

---

prejudice and refiled in California state court on May 17, 2023, (Dkt. 1-5, at 4–15; Dkt. 1-4, at 5–14). On November 20, 2023, Patricia moved to quash the summons and complaint for lack of personal jurisdiction. (Dkt. 1-5, at 18–28.) This motion was denied. (Dkt. 1-7, at 54.) Patricia's appeal and petition for writ of mandate were also denied. (Dkt. 1-9, at 11; Dkt. 1-10, at 188.) On March 8, 2024, she filed her petition of removal with this court under diversity jurisdiction. (Def.'s Pet., Dkt. 1.)

United States District Court
Northern District of California

> Given their familial relationship, Patricia was able to exert undue influence over her parents by controlling access and maintaining secrecy related to information associated with them being added to the title on the Property and their dependency application. Patricia also exerted undue influence over the Murmans in coercing them to help fund the Property purchase under a false promise of an ownership interest.

(FAC ¶ 23.) Because she never returned their financial contributions, even upon Susan's explicit request, the FAC states that she has committed financial elder abuse under § 15610.30 and § 15657.5(a). (FAC ¶ 87.) The FAC further alleges that Patricia acted with "recklessness, oppression, fraud, and malice" under § 15657.5(b) and California Civil Code § 3294, and thus requests punitive and exemplary damages in an amount determined at trial; it also requests treble damages under California Civil Code § 3345 and attorney's fees and costs under Welfare and Institutions Code § 15657.5(a). (FAC ¶¶ 87–89.)

**LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To carry this burden, the non-moving party must

7

"do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252 (1986). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

It is the job of the parties to support their arguments with specific factual showings; while the court may consider other documents on file when appropriate, it has no obligation to sort through papers not specifically cited by the parties. *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028–31 (9th Cir. 2001). The court draws all inferences in the light most favorable to the nonmoving party but does not make credibility determinations or weigh conflicting evidence when reviewing the record on summary judgment. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).

**DISCUSSION**

*1. Claim Three: Unjust Enrichment*

Defendant moves for summary judgment in her favor as to Claim Three for unjust enrichment. Under California law, a plaintiff making a claim for unjust enrichment must show (1) "receipt of a benefit" and (2) "unjust retention of the benefit at the expense of another." *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1094 (N.D. Cal. 2025); *accord*, *Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 239 Cal. Rptr. 3d 908, 915 (Cal. Ct. App. 2018). To qualify as unjust enrichment, the retention of the benefit must be without basis in law; "the 'mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor.'" *Dinosaur Dev., Inc. v. White*, 265 Cal. Rptr. 525, 528 (Cal. Ct. App. 1989) (quoting *Marina Tenants Assn. v. Deauville Marina Dev. Co.*, 226 Cal. Rptr. 321, 328 (Cal. Ct. App. 1986)) (internal citations omitted). Thus, unjust enrichment typically involves a benefit conferred because of "mistake, fraud, coercion, or request," though other conduct may qualify so long as it renders the retention unjust. *Russell v. Walmart, Inc.*, 680 F. Supp. 3d 1130, 1133 (N.D. Cal. July 5, 2023) (quoting *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015));

United States District Court
Northern District of California

*Riganian*, 791 F. Supp. 3d at 1095 ("the Court's emphasis in *Russell* was on whether retention of the benefit would be *unjust*—not on identifying 'mistake, fraud, coercion, or request' as the only possible ways in which such retention could be unjust." (emphasis in original)). Examples of benefits that do not warrant restitution include those conferred incidentally through behavior intended to serve oneself, gifts, and voluntary payments not made to satisfy a debt.[10] *See Dinosaur Dev.*, 265 Cal. Rptr. at 528; *Foster Poultry Farms, Inc. v. Suntrust Bank*, No. 104-CV-5513 OWW SMS, 2008 WL 1970823, at *7 (E.D. Cal. May 5, 2008) ("unjust enrichment is defined as a 'benefit obtained from another, not intended as a gift and not legally justifiable. . .'" (quoting *Unjust Enrichment, Black's Law Dictionary* (8th ed. 2004))).

Defendant first argues that the downpayment was an undisputed gift from Plaintiff to the escrow company on Defendant's behalf, citing to the Gift Letter as proof. (Def.'s Mot., Dkt. 59, at 4–5.) Defendant then argues that Patricia did not elicit the repairs nor agree to pay Plaintiff back for any work done on the house—she contends that her parents "unilaterally elected" to spend money on the house and she is not obligated to repay these contributions. (Def's Mot., Dkt. 59, at 5.) Finally, she argues that there is no evidence that she committed mistake, fraud, coercion, request, or any wrongful conduct, and that merely acquiring a benefit from another does not establish unjust enrichment. (Def.'s Mot., Dkt. 59, at 5.) Plaintiff contends that whether the retention of a benefit is unjust depends on the circumstances and is generally a factual question that cannot be addressed on summary judgment. Plaintiff also points to evidence in the record that contradicts the Gift Letter as to her intent and argues that the Gift Letter is not the only evidence that may be considered to determine intent. (Pl.'s Resp., Dkt. 60, at 3–4.) Because there is evidence from which a reasonable jury could find in her favor, Plaintiff argues that summary judgment is not appropriate. (*Id.*)

Defendant's first argument—that the downpayment was conclusively a gift—has already been rejected by this court. (Order, Dkt. 55, at 27–29 ("Defendant's contention that the

---

[10] Under California law, the elements of a gift are "(1) competency of the donor to contract; (2) a voluntary intent on the part of the donor to make a gift; (3) delivery, either actual or symbolic; (4) acceptance, actual or imputed; (5) complete divestment of control by the donor; and (6) lack of consideration for the gift." *United States v. Alcaraz-Garcia*, 79 F.3d 769, 775 (9th Cir. 1996).

contemporaneous evidence uniformly suggests donative intent is not borne out by a review of the record.").) However, given that Defendant has renewed this argument—despite providing no new evidence—in the context of unjust enrichment, the court's prior findings bear repeating. Defendant's argument that the downpayment was a gift and thus any related benefit was not unjustly retained relies almost exclusively on the Gift Letter. (Def.'s Mot., Dkt. 59, at 5.) The Gift Letter is a document from the mortgage company signed by Susan on June 2, 2020, certifying that she was making a $400,000.00 gift to Patricia for the purchase of the Hawaii house. (Van Dine Decl. Ex. E, Dkt. 42-1, at 15.) It also states that "[n]o repayment of the gift is expected or implied" and that the signatories understand that it is a federal crime to make a false statement about the facts certified in the document. (*Id.*) According to Defendant, Susan's signature on the Gift Letter is undisputed, definitive proof that the downpayment was intended to be a gift.

Defendant's characterization of the record omits other evidence tending to show that a gift was not intended—although the Gift Letter is evidence supporting donative intent, it is not the only evidence in the record that may be considered as to Susan's intent at the time of the transfer.[11] *See, e.g.*, *Snyder v. Snyder*, 242 Cal. Rptr. 597, 600 (Cal. Ct. App. 1987) (accepting documentary evidence of intent to supersede original document creating gift); *Sprague v. Walton*, 78 P. 645, 646–47 (1904) (considering evidence beyond writing in will); *In re Detiege*, No. 4:19-AP-08029-JMM, 2022 WL 843374 (B.A.P. 9th Cir. Mar. 22, 2022) (considering all evidence of donative intent despite existence of gift letter under similar Idaho law); *cf. Burkle v. Burkle*, 46 Cal. Rptr. 3d 562, 567–68 (2006) (considering multiple kinds of evidence to determine whether donative intent could be resolved upon summary judgment). Moreover, there is evidence in the record that tends to show there was consideration for the downpayment, negating a key element of

---

[11] There is no California rule that would prevent the trier of fact from considering extrinsic evidence in this case. California's parole evidence rule applies "where the parties have reduced to writing what appears to be a complete and certain agreement." *Ferguson v. Koch*, 268 P. 342, 344 (Cal. 1928). The Gift Letter is not a written contract between Susan and Patricia and does not attempt to integrate any of the terms of their discussions pertaining to the purchase of the house—instead, it is a form document that may be considered alongside other evidence. *See In re Detiege*, No. 4:19-AP-08029-JMM, 2022 WL 843374, at *3 (B.A.P. 9th Cir. Mar. 22, 2022) ("The parol evidence rule is inapplicable here . . . [t]he Gift Letter is a form document that contains no terms and, at best, evidences an agreement between Debtors and their lender, not one between Debtors and Mrs. Rosauer.").

a gift. In addition to the Gift Letter, the record includes Susan's declaration that she believed the Gift Letter was a standard part of the closing process and she still expected to be added to the title of the house, (Susan Decl. ¶ 10, Dkt. 44-2); an email Susan sent on May 7, 2020, asking whether listing only Patricia on the title at closing would create issues with adding her and Michael to the title later, (Susan Decl. Ex. A, Dkt. 44-2, at 7); an email Susan sent on January 29, 2019, indicating that the parents were thinking of moving into the shared home to facilitate Michael becoming Patricia's dependent, (Hanway Decl. Ex. B, Dkt. 44-1, at 18); and Patricia's statement that, at the time of closing, she thought her mother expected to be added to the title, (Patricia Dep. 80:24–81:3, May 29, 2025). A reasonable trier of fact could find, based on this evidence, that the Gift Letter did not represent Susan's true intent and that she had a reasonable expectation of either receiving an interest in the property, Michael and/or herself becoming Patricia's dependent, or both in exchange for the downpayment.[12] There is enough conflicting evidence to create an issue of material fact as to donative intent. "The ascertainment of donative intent is a question of fact to be determined by the trial court from all the evidence and circumstances of the transaction." *Napa Valley Bank v. Morgan*, No. CIV.S-90-1355MLS JFM, 1994 WL 720242 (E.D. Cal. Sept. 15, 1994) (citing *Matson v. Jones*, 77 Cal. Rptr. 717, 719 (Cal. Ct. App. 1969)).

Defendant next contends that Susan and Michael's contributions to the home repairs and renovations were not made with her knowledge or at her request, and instead were benefits involuntarily or incidentally acquired that are not subject to repayment under a theory of unjust enrichment. A person generally has no right to restitution for benefits that were conferred "incidentally to the performance of his own duty or to the protection or the improvement of his own things," or for benefits that were conferred "on another *officiously*, i.e., by unjustified interference in the other's affairs." *Dinosaur Dev.*, 265 Cal. Rptr. at 528 (first quoting Restatement

---

[12] Defendant has also contended that declarations after the fact are not as persuasive as the contemporaneous evidence of the Gift Letter—however, this is for the trier of fact to decide, and declarations of the grantor are generally admissible evidence in cases where intent is at issue. *See Mecchi v. Picchi*, 54 Cal. Rptr. 1, 5 (Cal. Ct. App. 1966) ("Likewise, in gift cases declarations made by the grantor before, contemporaneously, and subsequent to the alleged gift are admissible though the statements be self-serving."). Moreover, courts may consider and rely on later declarations and testimony by the parties as to their intentions at the time of the transfer when deciding the nature of a transaction. *See Eklund v. Eklund*, 173 P.2d 50, 51 (Cal. Ct. App. 1946) (trial court properly relied on the parties' testimony to find that a gift was intended).

(First) of Restitution § 106 (Am. L. Inst. 1937), then quoting 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 97, at 126) (emphasis in original). Many cases of incidental or officiously conferred benefits involve parties who had no involvement in or knowledge of the benefits before they were conferred—for example, cases where one person's improvement of their own property raised the value of the surrounding properties. *See*, *e.g.*, *Major-Blakeney Corp. v. Jenkins*, 263 P.2d 655, 664 (Cal. Ct. App. 1953) ("A property owner who conceivably acquires some incidental benefit from an adjoining landowner's improvements made pursuant to the latter's private development plans is not required to account for the benefits so received.").

The key factor in these other incidental or officious benefit cases is that the defendant had no part in the conferral of the benefit or the loss or expense borne by the plaintiff. *Cf Gen. Star Indem. Co. v. First Am. Title Ins. Co. of Napa*, No. 20-CV-03210-TSH, 2021 WL 916850, at *4 (N.D. Cal. Mar. 10, 2021) ("Venuta did not fortuitously benefit from First American repayment of the US Bank loan – he in part caused the loss by not repaying his own loan when it became due."). While it may be found that Defendant did not elicit the home repairs or agree to pay back her parents for the money they spent on the house (although this is contested), there is some evidence tending to show that, at the very least, she knew that Plaintiff expected to be added to the title of the house and thus expected to benefit from increasing the value of the home. Plaintiff explicitly contends that she made the home improvement and repair payments because she believed that Defendant would add her to the title of the house based on Defendant's representations. There is a question of material fact as to whether and when such representations were made, and the exact content of these alleged representations and promises. As it stands, there is enough evidence that the trier of fact could conclude that it would be unjust for Defendant to retain the benefits of the money Plaintiff spent improving the house.[13] Summary judgment is thus not appropriate on this

---

[13] Moreover, Defendant is incorrect that "mistake, fraud, coercion, or request" are the only means by which retention of a benefit may be rendered unjust. *See Riganian.*, 791 F. Supp. 3d at 1095 (the emphasis is on "whether retention of the benefit would be *unjust*—not on identifying 'mistake, fraud, coercion, or request' as the only possible ways in which such retention could be unjust." (emphasis in original)). Thus, the trier of fact may find that Defendant's actions did not rise to the level of fraud, mistake, coercion, or request, but it would nevertheless be unjust for her to keep the benefit of her parents' investments in the house because she thought her mother expected to be on the title, she did not add her mother to the title, she sold the house for more than they had paid for it in part because of her mother's repairs, and she kept all the proceeds for herself.

United States District Court
Northern District of California

question. For the foregoing reasons, Defendant's Motion for Summary Judgment on Claim Three is DENIED.

### 2. *Claim Four: Financial Elder Abuse*

Defendant argues that she is entitled to summary judgment as to Claim Four for financial elder abuse because (1) the evidence is undisputed that the downpayment was a gift; (2) there is no evidence that Defendant influenced Plaintiff's decision to spend money on the house repairs; (3) there is no evidence that Defendant directed Plaintiff to "spend down" her savings or that Defendant was unable to make Michael her dependent; (4) elder abuse requires more than negligence, and there is no evidence of conduct beyond negligence; and (5) there is no evidence that Patricia acted with oppression, fraud, malice, or recklessness.

First, Defendant misstates the law on financial elder abuse. The court has already described above how the evidence is disputed as to whether the downpayment was a gift, but even assuming arguendo that the $300,000.00 was a valid gift, it could still constitute the basis for a financial elder abuse claim. Financial elder abuse occurs when a person "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both." Cal. Welf. & Inst. Code § 15610.30(a)(1). Taking or retaining property is further defined as depriving an elder of any property right, including by "donative transfer." Cal. Welf. & Inst. Code § 15610.30(c). The statute also provides a definition of "wrongful use," which does not necessitate the kind of misconduct indicated by Defendant— instead, all that is required is that the person who takes or retains the property "knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." Cal. Welf. & Inst. Code § 15610.30(b). If a person is found guilty of committing "recklessness, oppression, fraud, or malice" in the commission of their financial abuse, they will be liable for additional punitive damages, but this conduct is not necessary for a finding of financial elder abuse.[14] Cal.

---

[14] Defendant's brief cites to § 15657.2 for the proposition that financial elder abuse requires more than simple negligence, but this section (1) refers to suits against health care providers, and (2) does not include this language about negligence, which instead comes from cases interpreting when *enhanced remedies* may be available against health care providers. *See Carter v. Prime Healthcare Paradise Valley LLC*, 129 Cal. Rptr. 3d 895, 902 (Cal. Ct. App. 2011), *as modified* (Aug. 24, 2011) ("To recover the enhanced remedies available under the Elder Abuse Act from a health care provider, a plaintiff must prove more than simple or even gross

Welf. & Inst. Code § 15657.5. Thus, gifts and voluntary transfers may form the basis of financial elder abuse, and no heightened misconduct is required.

Second, Defendant mischaracterizes the evidence. Although much of the evidence is comprised of Defendant and Plaintiff's conflicting testimony about the relevant time period, there is enough to support a possible finding of financial elder abuse under the law as described above. The evidence establishes that Plaintiff contributed significant sums of money towards the downpayment and towards repairs to the house, that Defendant sold the house and kept all the proceeds for herself, and that Plaintiff was in a worse financial position after these transactions. Defendant has not proffered any evidence that she did not know or should not have known that this would have an adverse effect on Plaintiff, and the evidence is disputed as to many relevant facts, including Defendant's knowledge and state of mind, Plaintiff's intent, and what motivated Plaintiff's decision to leave the house.[15] From the evidence, the trier of fact could conclude that Defendant retained property transferred to her by Plaintiff when she knew that not returning the property would harm Plaintiff, which meets the requirements of financial elder abuse under the statute.[16] As such, summary judgment on the financial elder abuse claim is inappropriate and Defendant's Motion for Summary Judgment as to Claim Four is DENIED.

---

negligence in the provider's care or custody of the elder."). There is no provision that requires a showing of more than mere negligence—all that is required for financial elder abuse is the taking or retention of an elder's property by someone who knows or should know that such taking or retention will harm the elder.

[15] Moreover, if the trier of fact finds the existence of a contract and a breach of said contract by Defendant pursuant to Plaintiff's Claim One, Defendant may be liable for financial elder abuse if she knew or reasonably should have known that she was engaging in a harmful breach. *Paslay v. State Farm Gen. Ins. Co.*, 203 Cal. Rptr. 3d 785, 798–800 (Cal. Ct. App. 2016) (in the context of a breach of contract, "wrongful conduct occurs only when the party who violates the contract actually knows that it is engaging in a harmful breach, or reasonably should be aware of the harmful breach.").

[16] Defendant also argues that there is no evidence that she influenced her parents' spending decisions. Undue influence is a separate means by which financial elder abuse may be proven. Cal. Welf. & Inst. Code § 15610.30(c). Whether undue influence was wielded to cause a transaction is determined through considering (1) the victim's vulnerability, (2) the influencer's apparent authority, (3) the influencer's actions or tactics, and (4) the equity of the result. Cal. Welf. & Inst. Code § 15610.70. There is enough evidence in the record to create a question of material fact as to undue influence: Michael was ill and Susan spent much of her time caring for him, Patricia is their daughter and originally suggested that they move to Hawaii, they had no reason not to trust Patricia, Patricia apparently knew that at least her mother believed they would be added to the title and she decided not to add her anyway, and Patricia sold the house and did not pay back to her parents what they had contributed. As such, whether financial elder abuse via undue influence occurred cannot be resolved at the summary judgment stage.

United States District Court
Northern District of California

14

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

Dated: February 11, 2026

_____
ROBERT M. ILLMAN
United States Magistrate Judge

15